# EXHIBIT A

COMMERCIAL INVOICE

| SHIPPER'S (OR PERMANENT) ACTUAL SELLER | DOCUMENT NO | INVOICE DATE AND NO |
|---|---|---|
| Flow International Corporation<br>23500 64th Avenue South<br>Kent, WA 98032<br>USA<br>Phone: (253) 850-3500 | SO136349 | 05/01/2013 |

**Flow**

| OTHER REFERENCES |
|---|
| 05/01/2013          SO136349 |
| SQ Q0009328-1 |
| EIN# 91-1104842 |

| CONSIGNED TO ORDER OF (SHIPPER) FORT AGENT BANK | BUYER |
|---|---|
| BANCO DE BOGOTA SA<br>NIT 860.002.964-1<br>CARRERA 13 A N.35-38. PISO 4. OF. 21<br>BOGOTA DC - COLOMBIA<br>TEL: 57 1 3320032 EXT 2151 | BANCO DE BOGOTA SA<br>NIT 860.002.964-1<br>CARRERA 13 A N.35-38. PISO 4. OF. 21<br>BOGOTA DC - COLOMBIA<br>TEL: 57 1 3320032 EXT 2151 |

| NOTIFY PARTY/INTERMEDIATE CONSIGNEE | |
|---|---|
| | FCA - LOUISVILLE, KY<br><br>Cash in Advance |

| PRE CARRIAGE BY | PLACE OF RECEIPT BY PRE-CARRIER |  | |
|---|---|---|---|
| | LOUISVILLE, KY | | |
| VESSEL | PORT OF LOADING | COUNTRY OF DEPARTURE | |
| | | US | |
| PORT OF DISCHARGE | PLACE OF DELIVERY BY ON CARRIER | TOTAL GROSS WT | TOTAL NET WT | TOTAL CUBE |
| | Cundinamarca, CO | | 0.0000 | RG | |

| PARTICULARS FURNISHED BY SHIPPER | | | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| MKS & NUMBERS/CONTAINERS | # OF PKGS | | | | |
| 1) 043250-6<br>HS# 8456.90.3000<br>Origin: US | | WATERJET CUTTING SYSTEM M4-3060C<br>WITH 94ID INTENSIFIER PUMP<br>S/N: 413-14161 AND CUTTING HEAD XD<br>DISASSEMBLED FOR SHIPPING PURPOSES<br>ONLY | 1<br>ea | 437,830.00<br>ea | 437,830.00 |
| | | | | | |
| REFERENCE SUBTOTAL | | | | | 437,830.00 |
| | | | | | |
| SUBTOTAL OF INVOICE LINES | | | | | 437,830.00 |
| | | | | | |
| INVOICE GRAND TOTAL | | FCA - LOUISVILLE, KY | | USD | 437,830.00 |

| | | | INVOICE TOTAL | |
|---|---|---|---|---|
| FCA - LOUISVILLE, KY | | | USD | 437,830.00 |



These commodities, technology or software were
exported from the United States in accordance with the
Export Administration Regulations. Diversion contrary to
U.S. Law prohibited.

| NAME OF SIGNATORY |
|---|
| TERRE TALBERT |
| SENIOR EXPORT COORDINATOR |

| PLACE AND DATE OF ISSUE | |
|---|---|
| KENT, WA | 05/01/2013 |
| SIGNATURE | |



EXHIBIT
2
Certs   6-1348
PENGAD 800-631-6989



Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
1/25

## QUOTATION SUMMARY



496,870
- 25,600
- 50,000

421,870
(+) 15,960

437 830

7 metre
Base

Picture above depicts a Mach 4 4020c system

| System | Work Envelope | Price |
|---|---|---|
| **Mach 4 4030c** | **3.05 m x 6 m [10'-0" x 19'-7"]** | **$496,870** |

| Includes | | Description |
|---|---|---|
| 1 | Precision Z₃ Axis | Fully programmable servo-driven Z-Axis |
| | Dynamic Waterjet® XD | • Automatic taper compensation to produce 2D and 3D parts with tight tolerances at higher speeds<br>• Advanced beveling and 3D (5-Axis) capabilities |
| | PASER® 4 cutting system | • New industry benchmark in cutting heads<br>• 225 kg (500 lb) abrasive delivery system |
| 2 | FlowXpert™ PC-based controller | • FlowXpert touch screen controller<br>• FlowXpert software package |
| 3 | HyperJet® 94I-D intensifier pump | 100 hp, 6480 bar (94,000 psi) |
| 4 | Modular Material Support System | • Integrated water level control<br>• Modular design allows future expansion |
| 5 | Start-up services, installation, and training | Provided by Flow-certified technicians |
| 6 | Flow Advantage Program | Exclusively designed to help Flow customers reduce operating cost and run waterjet systems more efficiently |
| 7 | Warranty | One (1) year warranty |

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
2/25

| Options | | Description | Price |
|---|---|---|---|
| 8 | Dynamic Contour Follower™ | Automatic setting and tracking of the stand-off distance between the mixing tube tip and the material being cut for more efficient and accurate part cutting | $5,780 |
| 9 | UltraPierce™ | Allows the user to automatically pierce holes in brittle and composite materials without breakage or delamination | $2,890 |
| 11 | Laser edge finder | Allows operator to precisely position waterjet at an exact position on the work piece being cut | $695 |
| 12 | Additional seat FlowXpert™ software | Advanced features to maximize productivity while minimizing time | $3,580 |
| 13 | FlowNEST® part nesting module | Powerful geometric nesting module | $5,845 |
| 14 | Warranty | Two (2) year warranty | $6,200 |

*(handwritten annotations: N/C next to rows 8, 11, 13, 14; various handwritten calculations: "SOLD", "18,520", "+ 437,830", "# 456,350", "+ 5,780", "# 443,670")*

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com

**mach4**

 **Flow**

Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
3/25

| GENERAL COMMERCIAL TERMS | |
|---|---|
| PRICES: | All prices quoted in United States Dollars |
| DELIVERY POINT: | FCA (Louisville, KY) Incoterms 2000 |
| ESTIMATED SHIPMENT: | 10–20 weeks after receipt of order and approval of credit<br>*Subject to prior sale* |
| TITLE PASSAGE: | Origin |
| PAYMENT TERMS: | • 30% with Purchase Order<br>• 70% two (2) weeks prior to shipment<br><br>By wire transfer to our account or by irrevocable and confirmed letter of Credit drawn at sight in favor of Flow International Corporation advised by Bank of America, address follows. We reserve the right to ask Bank of America to add its confirmation at the buyer's expense as needed.<br><br>Bank of America<br>Flow International Corporation<br>ABA# 0260-0959-3<br>Account # 68807700<br><br>This transaction and all of its terms and conditions are subject to final credit approval. |
| SHIPMENT TERMS: | • Seller shall package goods for export and prepare export documentation.<br>• Buyer shall arrange for pre-carriage and main carriage of goods and pay all transportation costs.<br>• Buyer shall secure customhouse broker, arrange for import clearance, and be responsible for all duties, taxes, and fees associated with import clearance. Buyer shall be responsible for any local permits or licenses.<br>• Buyer shall be responsible for insuring goods and bears all risk of loss or damage.<br>• Buyer may not divert or re-export product to another country without the permission of the seller. The buyer may be responsible for reimbursement of any fees, fines, penalties, and costs resulting from an illegal diversion or re-export violation of United States export laws. |

NOTE:
Unless otherwise specifically stated in this quotation, the balance of the purchase price, together with any other related amounts, shall become immediately due and payable at the time the equipment included in this quotation, or any portion of it, is placed in service or used in any way other than in connection with its installation or testing.

Unless otherwise stated, pricing is valid for 30 days and may be modified or withdrawn by Seller prior to any acceptance.
Prices F.O.B. KENT, WASHINGTON, or JEFFERSONVILLE, INDIANA USA unless otherwise noted.

| OFFERED by Flow International Corporation (Seller): | ACCEPTED by Buyer: Julio Ruiz R |
|---|---|
| By: Javier Gómez | Company: Ruiz Fajardo Ingeniero SAS |
| Title: Country Manager | By: Gerente |
| Date: 11/05/2012 | Date: 11/05/2012 |

NOTICE: Sale of any product or services covered by this quotation is conditioned upon the terms contained herein (including those on the attached conditions of Sale form). Any additional or different terms proposed by Buyer are objected to and will not be binding upon Seller unless specifically assented to in writing by the Seller.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com

 **MACH**

 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
4/25

## TECHNICAL SPECIFICATIONS

### 1 Mach 4 Waterjet System

The Mach 4 waterjet features unparalleled technology and performance wrapped in a sleek and striking design. As the flagship waterjet system from the technology leader, every feature on the Mach 4 is designed to make you more productive. The Mach 4c gantry waterjet system is a modular design, meaning you can not only equip the system to meet a myriad of individual needs now—but also in the future. The Mach 4 is ideal for both high-production, high-speed cutting, or for the low production runs and high job variations common to just-in-time manufacturing.



Picture above depicts a Mach 4 4020c system

Some highlights include:

- The Mach 4 features complete four-sided work table access for the operator, featuring a convenient integrated step that allows the operator to conveniently reach all areas of the table

- Modular interface points and connectors to reduce electrical complexity, increase reliability, and make future upgrades and work table expansion possible

- Increased structural robustness through the use of heavy duty motion components and exceptional torsional rigidity

- Fully programmable servo-driven Z-Axis

- Standard air conditioned motion components ensure long life in any operating environment

- Standard touch screen mobile control station/cabinet increases the convenience and productivity of operating the machine from anywhere along the front of the work envelope

- Optimized high-pressure plumbing increases cutting power at the nozzle and reduce maintenance requirements over the life of the machine

- Equipped with an assortment of ergonomic user-friendly features, the Mach 4 goes beyond other machine tools to maximize productivity. Features recessed LED lights to illuminate the work area, multiple integrated air and water connections for part wash down and drying, and a host of many other features designed for operator efficiency.

- Dual-drive base axis (each of the base axes have dedicated servo drives)

- Standard environmental protection package is comprised of heavy-duty collapsing bellows to protect base and bridge rail systems from the harsh waterjet environment

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
5/25

- The Mach 4 base rails are designed below the top of the catcher, thereby reducing the potential impact of loading a heavy work piece. To avoid errors caused by thermal expansion due to catcher tank heat, as well as to isolate the precision motion system from vibrations caused by loading and unloading of heavy plate, the Mach 4c doesn't cut corners and takes the extra step of mounting the bases separate from the catcher.

- Major bridge and base components are laser inspected prior to assembly. After assembly, the entire machine undergoes stringent performance testing, including but not limited to, straightness/squareness/flatness inspection, and laser interferometer testing for positional accuracy. After the machine is installed at end-user site, ball bar testing is completed onsite to ensure retention of performance.

- Major welds are heat stress relieved, never vibratory stress relieved, to ensure maximum long-term stability

Precision Drive System

The Mach 4 features a state-of-the-art drive system, the Nexen® Roller Pinion System (RPS)—The Best Ride. Offered exclusively from Flow, this special motion system combines the best features of linear motors, precision ball screws and pinion systems without the compromises. The RPS System from Nexen allows the Mach 4 to ride flawlessly on precision roller bearings with revolutionary zero-backlash, high-speed performance.



The RPS Motion System is treated with a patented cryogenic process called "Raydent", that permeates the metal and permanently bonds with it to form a 1 mm (.04 in.) deep oxide ceramic layer resistant to corrosion and wear. This also eliminates any need for lubrication.

Machine Specifications

| Travel | |
|---|---|
| XY-Axis travel | 3.05 m x 6 m (10'-0" x 19'-7") |
| Z-Axis travel (standard) | 305 mm (12 in.) |
| **Speed Ranges** | |
| Rapid traverse maximum | 36 m/min (1400 in./min) |
| Contouring speed maximum | 25,400 mm/min (1000 in./min) |
| **Accuracy** | |
| Linear straightness accuracy | .025 mm/m (.001 in./3 ft) |
| Repeatability | .025 mm (.001 in.) |
| Temperature tolerance band | 20° ± 3° C (68° ± 5° F) |

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
6/25

## Dynamic Waterjet® XD

Dynamic Waterjet XD introduces the first high-precision 3D cutting technology of its kind. Using a small articulated wrist, the original Dynamic Waterjet automatically tilts the waterjet cutting head in any direction up to 10° to eliminate stream lag and kerf taper errors—resulting in the tightest part tolerances and highest cutting speeds. That same core technology has been developed further with Dynamic XD, incorporating groundbreaking advantages with up to 89° of articulation for bevel and 3D part production. Get *Dynamically Superior Parts* with Dynamic XD.



Features include:

- Rapid lift and drop is accomplished by precision servo drive
- Position feedback provides closed-loop control of the Z-Axis
- Provides up to 89° of motion
- Underwater or above-water operation
- 305 mm [12 in.] vertical travel
- Zero tool length design allows jet to maintain correct position without having to move the X or Y Axis during multi-axis moves, resulting in a quicker, more accurate finished part
- Easy access cover protects critical precision components
- Laser-alignment using Flow's exclusive DynAlign™ System ensures ultimate precision
- Patented wrist design minimizes singularity moves when operating in 5- Axis mode, creating an optimized cut path and a more attractive finished part

Additional information regarding Dynamic XD:

- 89° of motion does not guarantee an 89° effective angle cutting. Additional taper compensation and compounded angles will often create the need for additional degrees of motion beyond the desired finished angle.
- X–Y travel may be reduced when cutting large angles facing away from the center of the catcher tank. Z travel may decrease if floor is significantly out of level.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
7/25

- Equipment: 5-Axis waterjet cutting systems may require secondary safety systems for safe operation. These systems are specific to your installation. Flow offers standard solutions; please consult your Flow representative for assistance.

- Personnel: Safe operation of your system depends on proper installation and properly trained personnel. Flow offers training for your operators. Do not operate the equipment unless under the supervision of a certified technician.

Low-Profile Fixture Clamps

Low-profile clamps are adjustable to hold material from thin sheets to 38 mm [1.5 in.] thick. This low-profile design provides greater mobility of the machine within the cutting environment.

Laser Edge Finder

The laser edge finder allows a waterjet operator to precisely position their Flow waterjet cutting nozzle at an exact position on the work piece being cut. The laser edge finder is used to jog around the work piece to mark chosen locations. FlowXpert is used to quickly record these locations up to ten user-definable home positions can be programmed for the machine. The edge finder uses the locations to pinpoint the true edge of the material.

Integrated Air/Water System

Easily access air and water; both are on the same hand-held connection.

## PASER® 4 Cutting System

Building upon the success of the highest performing, most popular cutting heads in the waterjet industry, Flow engineers developed exclusive technology resulting in superior performance only available with Flow waterjet systems. Flow's newly designed PASER 4 cutting head establishes a new industry benchmark by featuring the greatest cutting speed coupled with the lowest operating cost.



PASER 4 Cutting Head

The cutting head accelerates the abrasive into the high-velocity waterjet to generate a high-energy abrasivejet cutting stream capable of cutting virtually any material.

The PASER 4 cutting head features:

- Orifice design increases component life 3–6 times over earlier generations and competing cutting heads

- On/Off valve allows for longer lasting components and higher reliability, decreasing maintenance required and increasing up time

- Increased productivity—longer-lasting parts means more runtime between maintenance intervals, lower inventory carrying costs and lower operating costs

- Orifice and mixing tube alignment is optimized by using tapered surfaces and an exclusive precision collet that automatically aligns all critical components

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
*tel* 253.850.3500 | *toll-free* 800.446.3569 | *fax* 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
8/25

- PASER 4 features a 101 mm [4 in.] long mixing tube, which allows for a significant increase in life and reduction of taper over other cutting systems

### PASER 4 Metering Valve

Flow's PASER 4 metering valve eliminates abrasive clogging and surging for more consistent performance. The design ensures that the abrasive remains dry in particularly wet cutting environments. The new PASER 4 metering system delivers the precise amount of abrasive required by the PASER 4 cutting head in order to ensure maximum cut speed and efficiency.

### PASER 4 Plumbing Package

The evolution of high-pressure plumbing led to a simple yet effective design for the high-pressure whip package. No swivels are needed, eliminating maintenance and line loss. The inherent flexibility of the long steel tubing provides all the necessary degrees of freedom that a moving cutting head requires.

Includes the following:

- High-pressure gauge
- 9.5 mm [⅜"] OD high-pressure whip
- Plumbing support column

### PASER 4 Start-Up Kit

The PASER 4 cutting head comes with a standard start-up kit designed to get you up and running for the purpose of training and familiarization.

### Abrasive Delivery System

The abrasive delivery hopper holds approximately 225 kg [500 lb] of abrasive. Low-pressure compressed air transfers the abrasive to the cutting system through an abrasion-resistant hose.



Features include:

- Low-level warning and shutdown sensors
- Trash screen for loading convenience
- Simple electrical and mechanical controls
- Requires clean, dry, customer-supplied shop air

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
9/25

## 2   FlowXpert™ PC-Based Controller

Flow's touch screen PC-based controller with FlowXpert is the most advanced, state-of-the-art machine tool control system in the waterjet industry. This Simple Yet Powerful software suite is designed to be easy to use by operators of all skill levels. Integrated buttons turn on/off a variety of accessories, including machine LED lights, laser part locator, and machine water level control.



### Hardware and PC

The PC hardware includes:

- Mobile control console
- 381 mm (15 in.) color screen
- Keyboard, mouse, and USB port

### FlowXpert Software Package

FlowXpert features a host of advanced features to maximize your productivity while minimizing your time. Start out by drawing a part with our easy-to-use design software, or simply import a part from virtually any standard CAD format such as DXF. FlowXpert even allows the user to easily manipulate the most complex 3D models. Once your geometry is chosen, FlowXpert applies Flow's exclusive SmartStream™ technology to optimize cutting speeds based on a variety of user- input parameters such as desired edge finish, material thickness, and material.

Using our unmatched experience as the inventors of abrasive waterjet, we have created the most extensive material library in the industry, featuring well over 100 lab-tested materials. FlowXpert, featuring SmartStream™ technology, understands precisely how the material and its thickness will affect stream behavior and takes all the guesswork out of making a perfect part the first time.

Features include:

- Exclusive FlowXpert SmartStream™ technology turns any novice operator into a professional
- Automatic and full control of the complete waterjet system directly from the control
- Simple and logical interface puts the operator in control
- Diagnostic screen allows easy system troubleshooting
- Dynamically switch between languages while running program, so multiple users can work in the language of their choice without having to shut the program down

- SmartStream™ cutting models assure high-quality finished parts
- Context-sensitive tool tips and integrated users guide in the Help section
- Displays real-time tool location, including both machine home and floating user home
- 0 to 125% feedrate override
- Imports industry standard 2D and 3D CAD formats including: DXF, DWG, IGS, IGES, PDF, SAT, SAB, STP, STEP, 3DM, EMP, EMN, STL and native SolidWorks® files

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
10/25

- Unique modifiable tool path generation with automatic lead-in and lead-out and rapid traverse lines

- Part tabbing function for user to choose the location, gap and length of entry and exit points for a part tab

- User-friendly, icon-based menu structure

- Easy-to-use 2D and 3D CAD drawing and editing tools

- Realistic rendering capability

- 3D chamfering and radius tools

- 3D sheet folding/unfolding capability

- 3D cleanup tool automatically identifies 3D geometry errors prior to toolpathing

- Line, arc, rectangle, circle, ellipse, array, curve (spline), fillet, mirror, rotate, scale

- Easy, quick, surface quality specification

- Part preview displays and one click Dry Run option to test part programs

- Able to generate solid models

- Ability to pierce all holes first at low pressure, then cut at high pressure for use during special piercing operations of brittle materials

- Imports standard image and video formats including, JPG, BMP, PNG, TIF, GIF, WMV, and AVI files

- Powerful, custom macro functions available for special applications

- Full dimensioning and detailing capability

- Ability to generate customizable work order sheet

- Ability to set multiple user home positions

- Array nesting with adjustable gap between parts

- Restart a cut from any point on the path or nest

- Plate alignment function to compensate for plate rotation, angle or skew

- Ability to check volume and surface area of a finished part

- Full conceptual design functionality

- Automatic cost per part generation based on user-defined parameters

- Automatic and accurate part time estimation

- Graphical programming environment—no G-code is required

FlowNEST® Part Nesting Module

FlowNEST is a powerful geometric nesting module that allows the most efficient use of your material. The program allows you to nest parts on full sheets or partially cut sheets (remnants). FlowNEST has been designed by our programming staff solely for waterjet applications, so it is remarkably easy to use. After ordering the parts in FlowPATH®, use FlowNEST to maximize your material and, consequently, your profits. Features include:



Features include:

- Large entity capacity of 100,000 allows nesting of a virtually unlimited number of ordered parts (nesting time dependent up PC speed)

- Full geometric nesting—small parts can nest within larger parts

- Advanced batch processing allows input of several large nesting jobs and lets the computer develop nests on its own

- Quick-preview window displays the shape you intend to nest, saving programming errors

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
11/25

- Support of multiple cutting heads, determining nest pattern based on head-to-head spacing. Works in conjunction with FlowCUT® and only on rectangular sheets of raw material

- Optimized cut path—improved method of selecting the order in which parts are cut reducing, extraneous long rapid moves and cutting cycle time

- Programmer-controlled ability to change part cut sequence

- Ability to specify part orientation to accommodate material grain

- Common line cutting aligns parts side by side to create a common cutting line in order to save you cutting time and improve productivity

- Avoid previously cut parts—user can set the tool path in order to avoid traversing over previously cut areas to minimize the danger of cutting head collision and mixing tube breakage

- Full manual control—refine your nests with the ability to manually adjust parts (MOVE, COPY, ROTATE, DELETE) after automatic nesting is complete

- Generate sheet statistics, such as number of parts nested and percentage sheet utilization

- User-defined crop line for efficient remnant processing and storage

3  **HyperJet® 94i-D Intensifier Pump** Flow intensifier pumps set the industry standard for waterjet and abrasive waterjet cutting applications. Pressure = Productivity. Highlights include:

- 6500 bar [94,000 psi] maximum generated pressure and 6000 bar [87,000 psi] operating pressure

- The integrated  pump is located within the machine frame with easy access for maintenance

- Durable pump design with full intelligent controls, monitoring, and communication ability



- Dual 50 hp pumps for redundant power and reliability with lower initial power draw on start-up

- Additional control panel at pump for easy maintenance and diagnostics

- Innovative seal carrier design for maximum performance and easy maintenance

- Motor starter and electrical panel integrated on heavy duty pump frame

- Dual electrically-shifted 6500 bar [94,000 psi] rated HyperPressure™ intensifiers with ceramic plungers to minimize component wear

- Dual 50 hp TEFC electric motors

- Solid-state soft starter motor control

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com

 **MACH**

 Flow

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
12/25

- 1.1 L [67.1 in.³] maintenance-free attenuator to maintain constant output pressure

- Water booster and filtration system to ensure quality and constant water pressure; a two-stage filter bank filters water of particulate matter to 0.5 micron

- Controlled via FlowXpert™ solid-state industrial PC

Flow designed the HyperJet 6500 bar [94,000 psi] rated integrated pump to be easy to operate and maintain. All pump controls are found at the operator station. The pressure settings and pump on/off are conveniently displayed at the operator station. The integrated diagnostic screen displays the status of shutdown sensors for low hydraulic oil level, high hydraulic oil temperature, and low inlet water pressure. Also displayed are warning sensors for high hydraulic oil temperature, low inlet water pressure, high bleed-down, and check valve temperature.

Additional features include:

- Full electronic pressure control means the pressure setting and control is integrated into the Flow controller which greatly enhances operator convenience

- Dual pressure control - provides the user with a simple way to switch between two output water pressures. It is designed for applications where a low-pressure pierce is necessary before a higher pressure cutting operation.

- Digital pressure transducer and display make it easy for operators to see their operating pressure reducing the possibility of damaged work materials due to incorrect pressure

- Cooling water flow control uses a thermostatically controlled valve to regulate cooling water flow while minimizing water usage

- Automatic high-pressure bleed-down valve to relieve system water pressure to 0 bar [0 psi] within 1 second of shutting down the pump

- When the pump is powered down or the emergency stop is activated, solenoid valves automatically shut off both the filtered water and pump cooling water. This option overrides automatic cooling water flow control and maximizes water savings.

In addition to exceptional performance and high reliability, safety is designed into all Flow products. This pump is designed for safe, reliable, continuous operation at 6000 bar [87,000 psi] in tough industrial cutting applications.

Pump Enclosure

The ultrahigh-pressure pump rests within an attractive enclosure that is visually and functionally integrated into the machine tool system. Features include:

- Air assisted lifting top

- Removable side panels for full maintenance accessibility

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
13/25

**HyperJet Pressure Loading Tool**

A hydraulic pressure loading tool allows for quick, accurate, and easy seal changes.

**HyperJet Tool Kit**



As with any high-performance machine, the HyperJet pump requires periodic maintenance and service. Flow created exclusive tools to ensure easy, consistent and reliable maintenance for all HyperJet components. The customized tool kit facilitates maintenance and consists of items such as girth and spanner wrenches and seal installation tools. In addition, you will receive medical alert cards for the system operators.

## 4   Modular Material Support System

More than just a catcher tank, Flow's Modular Material Support System incorporates a host of features that will provide tremendous benefits to your operator every day. Features include:

- Heavy-duty steel construction

- Independent leveling system allows for complete isolation from the motion system

- 850 mm [33.4 in.] work table height

- Replaceable slats installed in a curved configuration to increase load-bearing capability. The curve configuration reduces splash back when cutting square parts.

- 1000 kg/m² [200 lb/ft²] load rating

- Slats can be easily customized to match specific applications (i.e., increased slat depth for thick cutting or decreased gauge for delicate applications)

- Tooling clamp support platform

**Water Level Control Module**

Integrated with the Modular Material Support System, the water level control module enables water level control at the operator station. The ability to set the desired water level allows for underwater cutting, which virtually eliminates cutting noise and dramatically increases cleanliness.

## 5   Start-Up Services, Installation, and Training

Flow International Corporation (Flow) will provide a qualified Field Service Engineer (FSE) to perform start-up services at the customer site following the customer's placement of the system in accordance with Flow's instructions and pre-installation package.

Up to one (1) day on-site equipment operation and maintenance familiarization training is included. Also included is a four (4) day of intensive high-pressure system maintenance and software training class at one of Flow's regional facilities.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
14/25

Customer Installation Responsibilities

The customer is responsible for the following:

- Fully uncrate the equipment and place it in its final location. The catcher must be positioned and leveled. The X-Y machine is to be simply located in the proper position as final assembly, and leveling will be performed by Flow, with the customer's assistance.

- Perform all electrical, water, cooling, drain, and air connections, in accordance with all local codes. Flow's pre-installation package will depict the utility and connection requirements.

- The customer must fill the pump reservoir with the proper oil

- Schedule start-up services to coincide with the completion of the customer's installation responsibilities by calling Flow's Technical Service Coordinator at least three weeks prior to the desired arrival of FSE. The customer must allow at least one week between final delivery of the equipment and the arrival of the FSE.

- Provide qualified technicians to assist Flow's FSE with the startup of the system. This is especially beneficial as a means to further acquaint the customer's technicians with the system.

Start-Up Services

Flow will do the following:

- Provide on-site start-up services to ensure a professional installation of your new waterjet system performed by a FSE. Flow may, at its option and cost, include the services of an additional FSE for part of the start-up service period.

- Flow's FSE will review the pre-installation work to ensure that the electrical, plumbing, pneumatic, and other services have been performed in accordance with Flow's recommendations.

- Assemble, level, and align the X-Y machine with the assistance of a customer-provided maintenance technician

- Custom-form all high-pressure tubing to connect the intensifier pump to the X-Y machine, with the assistance of a customer-provided facility technician to bracket or mount tubing as required.

- Perform initial start-up of the system with the assistance of the customer's electricians and plumbers

- Flush the system, perform any necessary corrective measures, and commission the system for full operation

Training

Flow will provide:

- Approximately four (4) hours of on-site maintenance familiarization. Maintenance technicians will receive an overview of the shapecutting system. This is a familiarization course only and is not intended as a substitute for Flow's four day training class.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
*tel* 253.850.3500 | *toll-free* 800.446.3569 | *fax* 253.813.9377
FlowWaterjet.com





Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
15/25

- Approximately four (4) hours of on-site operator familiarization. The familiarization will reacquaint operators who have attended Flow's system training class and give them the ability to operate it in a production capacity. This familiarization also requires that operators have good working knowledge of personal computers and Windows. This is a familiarization course only and is not intended as a substitute for Flow's one week training class.

- Four (4) days of system training for up to two people in Jeffersonville, Indiana (Louisville) or Kent, Washington (Seattle). The training will include operation and programming training on the X-Y machine and maintenance training for the high-pressure system. The customer should contact Flow's Technical Service Coordinator for schedule availability at least four weeks prior to the desired training dates. Flow recommends that training occur prior to installation as it will be required for operating the system. The operation and programming training requires that operators have good working knowledge of personal computers and Windows. All travel and living expenses are the responsibility of the customer.

**Note:** For customers who only require maintenance training on the high-pressure system, Flow also offers a two-day high-pressure maintenance training class in Kent, Washington (Seattle) that may be attended in lieu of the above training. Please contact Flow's Technical Service Coordinator for further information.

Additional installation or start-up services and additional training is available from Flow at our standard rates for technical services.

Inlet Water Test Kit

Test kit is used to sample inlet water quality to determine if a water softener or other pre-treatment is required.

Professional Project Management

From purchase to installation, you will have a single point of contact to ensure an efficient system start-up. You will receive a thorough presentation of utility requirements and individualized project coordination, with personal attention and rapid response to special requirements.

## 6 Flow Advantage Program

The Flow Advantage Program has been exclusively designed to help Flow customers reduce their operating cost and run their waterjet systems more efficiently.

In return for agreeing to exclusively purchase Flow spares, Flow Advantage customers will receive the following benefits:

- Exclusive 6% discount on all orders placed on FlowParts.com (currently available in North America and Europe) Place nearly all order requirements on-line at any time that is convenient for you.

- Free application support

- Quarterly specials exclusive to Flow Advantage members

- After utilizing the free training included in the initial install package, future training will be at half-price. Knowledgeable, well-trained operators will optimize your operations and properly maintain your equipment. Less downtime, accurate cutting, and efficient operations are the result. This is a $500 value.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



# Flow

- Free accuracy certification. We recommend that a ball bar test be conducted annually to ensure that the system is cutting within its designed tolerance specifications. This is a $2,000 value.

- Exclusive discount structure on mixing tubes, orifices, and other consumables

- Free water quality test kit. Water quality may be the single most important factor affecting orifice life. Order a free test kit annually: $150 value

If you have any questions regarding this information, please call Customer Service at 800.526.4810.

## 7  One (1) Year Warranty

Flow's standard one (1) year warranty applies.

## OPTIONS

## 8  Dynamic Contour Follower™

The Dynamic Contour Follower (DCF) allows for automatic setting and tracking of the stand-off distance between the mixing tube tip and the material being cut, allowing for more efficient and accurate part cutting.



The DCF system works up to a 4° tilt on material [70 mm/1000 mm (2.75 in./39.4 in.)] and a top speed range up to 1775 mm/min (70 in./min). At faster traverse and contour speeds, the cutting head and DCF can be selected to automatically rise for efficient travel.

The DCF will work on virtually any surface and is ideally suited for applications using material that can experience stress relief, or non-flat sheets with variations in material surface height, as it frees operators from manually adjusting standoff during cutting.

### Anti-Collision Sensor

In addition to setting the nozzle tip to material standoff height, the DCF can be used with an optional anti-collision sensor, designed to detect and prevent collisions with obstructions that could damage the cutting head and mixing tube.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
17/25

## 9 UltraPierce™

The UltraPierce vacuum assist allows the user to automatically pierce holes in brittle and composite materials without breakage or delamination. A vacuum created in the cutting head draws abrasive into the mixing chamber before turning on the high-pressure water. This eliminates top surface damage due to "water hammer."

The system mounts to the nozzle body and is controlled from the PC. The vacuum assist includes 3 main features:

- Vacuum assist unit: Mounts to the cutting head and contains a small vacuum unit and pinch valve to seal the cutting head when the unit is not in use

- Solenoid control assembly: Mounted to the Z-Axis and contains the solenoid valve and logic to control the assist unit

- Abrasive containment (shop vac): Contains and stores the excess abrasive used by the system and prevents the discharge of abrasive dust into the work environment

## 10 Ebbco® Abrasive Removal System

The abrasive removal system is designed to continuously remove exhausted abrasive that collects in the catcher tank thus eliminating downtime for cleanout and maximizes production. The system includes:

- Custom fit sweeper package

- Automatic controls

- Safety shutdowns

- Heavy-duty separator

- Heavy-duty closed column pump

- Abrasive hopper with removal bag for drying, disposal, or recycling

- One (1) year warranty from Ebbco, Inc.

## 11 Laser Edge Finder

The laser edge finder allows a waterjet operator to precisely position their Flow waterjet cutting nozzle at an exact position on the work piece being cut. The laser edge finder is used to jog around the work piece to mark chosen locations. FlowMaster or FlowXpert is used to quickly record these locations up to ten user-definable home positions can be programmed for the machine. The edge finder uses the locations to pinpoint the true edge of the material.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
18/25

## 12 Light Curtains

Flow will provide a perimeter light curtain set to ensure a safe working environment. This package will consist of a sending unit, receiving unit, and two mirrors to protect three sides of the work area, and will be fully integrated into the control system. When activated by the operator, the light curtain set will form a "safety chain" around the catcher tank area. As soon as an object penetrates the protected field, the light curtain will send an E-Stop command to the control system, stopping machine movement and the flow of high-pressure water to the cutting head.

## 13 Additional Seat of FlowXpert™ Software

Advanced features to maximize productivity while minimizing time. Includes additional seat of FlowNEST.

## 14 FlowNEST® Part Nesting Module

FlowNEST is a powerful geometric nesting module of FlowMaster that allows the most efficient use of your material. The program allows you to nest parts on full sheets or partially cut sheets (remnants). FlowNEST has been designed by our programming staff solely for waterjet applications, so it is remarkably easy to use. After ordering the parts in FlowPATH®, use FlowNEST to maximize your material and, consequently, your profits.



Features include:

- Large entity capacity of 100,000 allows nesting of a virtually unlimited number of ordered parts (nesting time dependent up PC speed)

- Full geometric nesting—small parts can nest within larger parts

- Support of multiple cutting heads, determining nest pattern based on head-to-head spacing. Works in conjunction with FlowCUT® and only on rectangular sheets of raw material

- Optimized cut path—improved method of selecting the order in which parts are cut reducing, extraneous long rapid moves and cutting cycle time

- Programmer-controlled ability to change part cut sequence

- Ability to specify part orientation to accommodate material grain

- Common line cutting aligns parts side by side to create a common cutting line in order to save you cutting time and improve productivity

- Advanced batch processing allows input of several large nesting jobs and lets the computer develop nests on its own

- Quick-preview window displays the shape you intend to nest, saving programming errors

- Avoid previously cut parts—user can set the tool path in order to avoid traversing over previously cut areas to minimize the danger of cutting head collision and mixing tube breakage

- Full manual control—refine your nests with the ability to manually adjust parts (MOVE, COPY, ROTATE, DELETE) after automatic nesting is complete

- Generate sheet statistics, such as number of parts nested and percentage sheet utilization

- User-defined crop line for efficient remnant processing and storage

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 **Flow**

## 15 Two (2) Year Warranty

- This warranty term is two (2) years from the date of system shipment or 4000 hours, whichever comes first. It covers the following: equivalent parts and outbound ground freight, scheduled labor, and travel expenses. All other elements of the Limited Warranty apply.

- In order to qualify for this warranty period, at least one person within the customer's organization assigned to maintain the equipment must attend a free system maintenance training course prior to or within three (3) months of system installation. If training is not elected, a one (1) year warranty will apply.

### General Customer Information

Please see general customer information listed below.

Utility Requirements at Customer Site

- Depending on system ordered, a transformer may be required. Transformers for 208V, 230V, and 575V services are available at additional cost.

- Disconnect electrical power supply to the waterjet system is required. The MRC panel will be Flow's termination point for all integrated pumps.

- Disconnect electrical power supply to the intensifier pump motor starter (if applicable) is required. The motor starter panel will be Flow's termination point.

- An insulated, isolated, dedicated ground for the control/power panel is required, located in the equipment floor area.

- A supply of clean, dry service air at 6–8 bar (90–120 psi) minimum, with a minimum volume or capacity of 0.42 m³/min (15 ft³/min) is required. UltraPierce™ can require up to 0.84 m³/min (30 ft³/min). The filter-regulator unit on the machine, the abrasive bulk transfer, and the catcher will be Flow's termination points.

- Flexible low-pressure water connections to and from high-pressure pump are required. The pump will be Flow's termination point.

- Effluent discharge connections from the pump and catcher to drain are required. The effluent drain will be Flow's termination point.

- Approved hydraulic oil is required for the intensifier pump (if applicable). Shell Morlina 100® oil is required for HyPlex® pumps. The oil is drained from the pump for shipping purposes.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com





Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
20/25

**Customer-Supplied Services and/or Equipment**

- Waterjet systems perform better with soft water. HyPlex® pumps perform to specification with a maximum inlet water temperature of 13-21°C (55-70°F) or less. Flow recommends the use of a water softener to pre-treat the cutting water. This inexpensive treatment to maximize orifice life can be easily obtained from your local water treatment dealer. Systems should be sized for 150% of your pump capacity, and should match your intended maximum duty cycle.

- On-site unloading of Flow equipment from delivery truck.

- Clear and unobstructed access to the floor area reserved for Flow equipment at customer facility.

- Transport of equipment to floor area reserved for Flow equipment.

- Service technicians to assist Flow-certified technicians during installation at customer facility.

- One (1) 3630 kg (8000 lb) capacity forklift at customer's facility for installation. Minimum fork length is 1.8 m (6 ft). A 2 m (7 ft) fork length is recommended.

- One (1) 2 m (7 ft) step ladder at customer's facility for installation.

**Environment**

- Please contact your Regional Sales Manager if the area you intend to place the waterjet cutting table has a ceiling height or obstruction 4.5 m (15 ft) or less from the floor. A low ceiling kit may be required.

- Recommended maximum ambient operating temperature is 40.6°C (105°F)

- To maintain accuracy, an adequate floor slab or foundation shall be supplied to support the equipment. Recommended floor level to ± 20 mm (¾") over machine envelope and free of cracks or joints within the entire machine area.

**Industry Standards**

Flow's Mach series of shapecutting machines are designed to the highest industry, national, and international electrical & safety standards for industrial machinery. At a minimum, the electrical design of the Mach 2c product line adheres to the following standards / norms:

- NFPA 70 (National Electric Code)

- NFPA 79 (Electrical Standard for Industrial Machinery)

- 73/23/EEC (EU Low Voltage Directive)

- 89/392/EEC (EU Machinery Directive)

- EN60204-1 (EU Safety of Machinery – Electrical Equipment of Machines)

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
21/25

- EN418 (EU Safety of Machinery – Emergency Stop Equipment)

- EN60439-1 (EU Low Voltage Switchgear and Control Gear Assemblies)

Flow's pumps are manufactured in a facility which follows the strict rules of manufacture and safety dictated in the ASME code Section VIII, Division 3, and is permitted to apply the U3 stamp to items which apply to the code. Specifically, Flow is "authorized to apply the 'NB' mark and register boilers, pressure vessels, or other pressure retaining items with the National Board of Boiler and Pressure Vessel Inspectors in accordance with its provisions."

All of Flow's standard waterjet products are CE marked and approved for sale in European Union (EU) countries. Flow International Corporation prides itself with designing and manufacturing safe products that meet or exceed established national and international safety requirements.

Any certifications required other than those listed above can be arranged by Flow for additional cost based on the local situation and requirements. Please contact your Project Manager for details.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



 Flow

Ruiz Fajardo Asociados, S.A.S.
13/33-QU208229-2
October 3, 2012
22/25

## TERMS AND CONDITIONS
### November 2008

The terms and conditions set forth in this document, the express terms and conditions of the attached quotation, and the terms and conditions in the order acknowledgement (if any) constitute the "Agreement" between Flow and the Buyer. These terms and conditions are intended to govern the sale of all Waterjet Cutting Systems, Surface Preparation systems, pumps, as well as spare parts and consumables for such systems (the "Equipment").

### 1.  LIMITED WARRANTY

a.   Flow warrants the Equipment to be free from defects in workmanship and materials for the period specified on the quotation, except that spare parts shall be warranted for a one-year period. This limited warranty does not cover normal wear and tear, consumable items including, but not limited to, seals, mixing tubes, filters, orifices, low and high-pressure plumbing and cylinders, or part failures caused by (i) accident or any act of God, (ii) abuse, or (iii) failure to maintain the Equipment in accordance with Flow technical specifications. Flow's liability is limited to repair or replacement of the Equipment and the determination regarding which of these is appropriate shall be at Flow's sole discretion. This warranty is conditioned upon (i) Flow being notified in writing by Buyer within one month after discovery of defects, (ii) At Flow's discretion, the return of defective Equipment to Flow (with RMA number assigned by Flow's customer service representative), with inbound transportation charge prepaid by Buyer, and return transportation charge paid by Flow, and (iii) Flow's examination of the Equipment and determination that such defects were not caused by negligence, misuse, improper maintenance, improper installation, accident or act of God, or unauthorized repair or alteration. Equipment or parts thereof furnished by Flow, but manufactured by others, shall carry the warranty that such product's manufacturer has conveyed to Flow, if any. The original warranty period of any Equipment that has been repaired or replaced by Flow shall not by virtue of such repair or replacement be extended. Warranty is void if non-Flow branded or certified or unauthorized parts are used.

b.   Flow warrants that all products manufactured by Flow comprised in the Equipment and furnished to Buyer are delivered free of any rightful claim of any third party for infringement of any valid United States patent. If Buyer promptly notifies Flow, in writing, that it has received notice from a third party that the Equipment infringes a U.S. patent, and provides Flow with all authority, information and assistance that Flow deems reasonably necessary, Flow shall in its sole judgment defend or settle any suit or proceeding against Buyer, at Flow's expense, to the extent that it is based upon claim of infringement which is a breach of the foregoing warranty, and Flow shall pay all damages and costs awarded therein against Buyer due to such breach. In case the use of any such Equipment is held in such suit to constitute such an infringement and the use of such Equipment for its intended purpose is enjoined or restricted by way of a court-ordered injunction, Flow shall, at its expense and option, procure for Buyer the continued usage of said product or part, or replace same with a non-infringing product or part, or modify same so it becomes non-infringing, or remove the product or part and refund the purchase price (less reasonable depreciation for any period of use) provided that any transportation costs are separately paid by Buyer. The foregoing states the entire liability of Flow for patent infringement by using said products or any parts thereof.

c.   The preceding paragraph shall not apply to (i) any Equipment that is modified, customized or manufactured to Buyer's design or specifications, or (ii) the use of any Equipment furnished to Buyer in combination with other products not furnished by Flow, unless the Equipment, per se, infringes the asserted patent. As to any such excluded product or part thereof, Flow assumes no liability whatsoever for patent infringement and Buyer shall hold Flow harmless against any infringement claims arising therefrom.

### 2.  LIMITATION OF WARRANTIES

EXCEPT AS PROVIDED IN SECTION 1 ABOVE, FLOW MAKES NO OTHER WARRANTIES TO BUYER, EXPRESS OR IMPLIED, AND HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 3.  ACCEPTANCE, DELIVERY, TITLE AND RISK OF LOSS

Unless otherwise specified by Flow in the quotation, delivery will be made and title will pass F.O.B. point of shipment to Buyer skidded for domestic truck shipment. Risk of loss or damage passes to Buyer on delivery. Any export or other special packing or special transportation charges shall be charged to and paid by Buyer.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com





Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
23/25

## TERMS AND CONDITIONS *(continued)*

Except as otherwise provided in the quotation, Flow shall not be responsible for freight transportation, insurance, shipping, storage, handling demurrage, or similar charges (including duties, taxes, VAT, etc.). If such charges are by the terms of sale included in the price, any increase in rates becoming effective after the date hereof shall be for the account of and responsibility of Buyer.

**4.   TIME NOT OF THE ESSENCE UNLESS EXPRESSLY PROVIDED**

Time is not of the essence with respect to any times or dates included in the Agreement unless the Agreement expressly indicates that those times or dates are of the essence. Any dates for payments from or by Buyer to Flow are of the essence.

**5.   EXCUSABLE DELAYS**

Flow shall not be liable for delays in delivery or performance, or for failure to manufacture, deliver or perform, for reasons including, but not limited to, (i) a cause beyond its reasonable control, or (ii) an act of God, act of Buyer, act of civil or military authority, Governmental priority, strike or other labor disturbance, flood, epidemic, war, riot, delay in transportation, or (iii) inability on account of a cause beyond the reasonable control of Flow to obtain necessary materials, components, services or facilities. Flow will notify Buyer of any material delay excused by this section and will specify the revised delivery date, as soon as practicable. Any such delay shall not give rise to any termination right and the date of such delivery or performance shall be extended for a period equal to the time lost by reason of delay.

**6.   BUYER'S CREDIT**

Flow may request advance payments or adequate security for deliveries required by the Agreement, including equipment already delivered. Flow reserves the absolute right, among other remedies, to terminate this Agreement or to suspend further performance under this Agreement in the event Buyer fails to provide such payments or security within 20 days of Flow's request.  Upon such termination or suspension, Flow shall be entitled, upon demand, to be indemnified for and against all costs and expenses already incurred or commitments made by Flow in or towards its performance under this Agreement.

**7.   DISCLOSURE OF INFORMATION**

Any information, suggestions or ideas transmitted by Buyer to Flow in connection with performance under this Agreement are not to be regarded as secret or confidential except as may be otherwise provided by agreement in writing signed by a duly authorized representative of Flow.

**8.   TAXES**

In addition to any price specified in the Agreement, Buyer shall bear, pay and be responsible for the gross amount of any present or future taxes, duties or levies, of a sales, use, excise, value added, goods and services or other similar nature, applicable to or assessable on the price, sale or delivery of any products or services furnished under the Agreement or to their use by Flow or Buyer or otherwise applicable to the transactions under the Agreement, or Buyer shall furnish Flow with evidence of exemption acceptable to the taxing authorities.

**9.   LIMITATIONS OF DAMAGES**

FLOW SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, LOSS OF USE, LOSS OF PRODUCTION, DAMAGE TO OTHER EQUIPMENT, COST OF CAPITAL OR INTEREST. FLOW'S LIABILITY IS LIMITED TO REPAIR OR REPLACEMENT OF THE EQUIPMENT AND THE DETERMINATION REGARDING WHICH OF THESE IS APPROPRIATE SHALL BE AT FLOW'S SOLE DISCRETION. THE PARTIES AGREE THAT THE FOREGOING REMEDY IS REASONABLE AND DOES NOT CAUSE THE AGREEMENT TO FAIL IN ITS ESSENTIAL PURPOSE.

**10.   CANCELLATION**

The Buyer does not have the right to cancel this Agreement or any portion of this Agreement unless the Buyer's request for cancellation is approved in writing by an authorized representative of Flow. If Flow so approves the cancellation of this Agreement or any portion of this Agreement, Buyer acknowledges that Flow will be damaged by the cancellation and that the damages sustained by Flow will be difficult to calculate.

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
*tel* 253.850.3500 │ *toll-free* 800.446.3569 │ *fax* 253.813.9377
FlowWaterjet.com



## TERMS AND CONDITIONS *(continued)*

Therefore, Flow is entitled to recover from Buyer the immediate payment of liquidated damages calculated as follows: (a) in respect of *Standard/Non-Customized Equipment and Spare Parts and Consumables*: an amount equal to (i) all costs and expenses incurred by Flow in its performance of the Agreement up to the date of approved cancellation, (ii) plus an amount equal to all commitments for or towards the purchase of goods, materials and services made by Flow in connection with the processing, handling and fabrication of the Equipment, (iii) plus the payment to Flow of 10% of the total sale price, which Buyer acknowledges represents a reasonable amount for Flow's overhead and profit; or (b) in respect of *Custom Equipment*: at Flow's option (i) an amount equal to the revenue recognized by Flow for the Equipment on a percentage of completion basis or (ii) the amount determined pursuant to (a) above with respect to Standard/Non-Customized Equipment. Any progress payments already made prior to such cancellation shall be applied towards the total amount determined according to the foregoing sentence.

### 11. INSTALLATION & TRAINING
Unless otherwise stated in writing in the quotation and except for Spare Parts and Consumables, **installation and training services are not included** in the sale price except as specified; however, such services will be provided if requested at seller's quoted service rate as may be applicable for standard working hours.

### 12. INTELLECTUAL PROPERTY
The Equipment and its documentation have been developed by Flow and represent a significant investment in industrial and intellectual property. No ownership of any patent, copyright, trade secret, technical data or other industrial or intellectual property is transferred to Buyer hereunder. No Equipment sale is to be construed as the grant by Flow to the Customer of any license to copy, modify, revise or reconstruct anything falling within the scope of patents, copyrights, trade secrets, technical data, or other industrial property of Flow or third parties.

### 13. INDEMNIFICATION
Buyer shall indemnify and hold Flow harmless from and against any and all losses, claims, costs, expenses, damages and liabilities, including reasonable attorney's fees, which Flow may suffer or be required to pay, arising out of injury (or death) to persons, or damage to property, resulting from or pertaining to the negligent use or operation of the Equipment whether or not occasioned by the negligence of Buyer, employees, independent contractors or invitees.

### 14. ENFORCEMENT
a.    **Validity, interpretation and performance.** The validity, interpretation and performance of the Agreement shall be governed by the laws of the State of Washington in effect at the time of contracting.  Ambiguities will not be construed against the drafter. Flow may bring an action to enforce the Agreement in state and federal courts located in the jurisdiction of the Buyer, or any other jurisdiction the venue rules of which would allow maintenance of such an action.

b.    **Default.** Buyer shall be in default of this Agreement in any of the following circumstances: (i) a failure to make any payment due within 10 days of the date on which that payment is due; (ii) a failure to perform or satisfy any covenant, condition or warranty of this agreement, other than payment, where such failure continues for 10 days after Buyer is given notice of such failure; (iii) Buyer's default under any note, security agreement, equipment lease or similar document evidencing indebtedness between Buyer and either Flow or a third party where such default permits the holder of such indebtedness to cause such indebtedness to become due before its stated maturity; (iv) any representation or warranty made by Buyer shall prove to be materially incorrect or the conditions of Buyer's business affairs shall change so as in the opinion of Flow to materially impair Flow's interest or increase materially Flow's credit risk; (v) Buyer shall generally not pay its debts as they come due, file or have filed against it a petition under any bankruptcy or insolvency law, make an assignment for the benefit of its creditors, consent to the appointment of a custodian, receiver, trustee or other officer with similar powers, be adjudicated insolvent or be liquidated; (vi) Buyer or any guarantor of Buyer is declared legally deceased (if Buyer is a sole proprietor or general partner) or if Buyer shall terminate its existence by merger, consolidation, sale of substantially all of its assets or otherwise; or (vii) Buyer shall agree with any third party to any lien or encumbrance that will in any way affect Flow's ability to obtain any of the remedies provided for in this Agreement.



 Flow

Ruiz Fajardo Asociados, SA.S.
13/33-QU208229-2
October 3, 2012
25/25

## TERMS AND CONDITIONS (continued)

c.   **Remedies.** Upon default by Buyer, Flow may exercise any or all of the following remedies with respect to the Equipment: (i) replevin, repossession or seizure, by judicial process or otherwise; (ii) acceleration of remaining payments so that these are immediately due; (iii) damages for any unpaid portions of the sales price, loss or for consequential or incidental damages and (iv) attorneys' fees and costs of litigation. This list of remedies is not exclusive or exhaustive. Each of these remedies shall be cumulative and in addition to any other remedies available under this Agreement, at law or in equity. In the event any amount due under this Agreement is not timely paid, Flow shall be entitled, in addition to any other remedy, to a finance charge of 1½% per month (18% per year) for such overdue amounts. This finance charge shall also apply to any suspension, termination or cancellation as provided in these terms and conditions.

## 15.   GENERAL TERMS

a.   **Flow's Terms Control.** ANY ACCEPTANCE OF THE ATTACHED QUOTATION MUST BE MADE ON ITS EXACT TERMS UNLESS FLOW EXPRESSLY AGREES TO ANY SUCH ADDITIONAL OR DIFFERENT TERMS. TO THE EXTENT THE ATTACHED DOCUMENT IS CONSTRUED AS AN ACCEPTANCE OF AN OFFER MADE BY BUYER, THE ACCEPTANCE IS EXPRESSLY MADE CONDITIONAL ON BUYER'S ASSENT TO ANY TERMS AND CONDITIONS IN THE ATTACHED DOCUMENT AND IN THIS DOCUMENT. FOR PURPOSES OF CLARIFICATION, ANY TERMS INCLUDED IN ANY BUYER-DRAFTED DOCUMENT (E.G. BUYER-REVISED QUOTATION, PURCHASE ORDER) DO NOT FORM PART OF THE AGREEMENT BETWEEN FLOW AND THE BUYER UNLESS FLOW EXPRESSLY AGREES TO ANY SUCH ADDITIONAL OR DIFFERENT TERMS.

b.   **Entire Agreement.** The Agreement constitutes the entire agreement of the parties, and they supersede all prior written or oral representations made by the parties with respect to the subjects addressed in this Agreement.

c.   **Amendments.** No purported modification or variance of the Agreement will be effective or enforceable unless made in writing and signed by an authorized representative of the party against whom enforcement of such a purported modification or variance is sought. For there to be a valid agreement by Flow, there must be a document manifesting that agreement and signed by an authorized representative of Flow. Flow will not be deemed to have entered into a contract as a result of its conduct, and Flow shall not be bound by any purported oral agreements, whether by operation of law or otherwise.

d.   **Industry Custom, Usage of Trade or Course of Performance.** The parties do not intend that the express terms of the Agreement will be modified, varied or supplemented by industry custom, usage of trade or course of performance unless the other documents (where applicable) comprised in the Agreement expressly incorporate such industry custom, usage of trade or course of performance.

e.   **Conflict Among Flow's Terms.** In the event of a conflict or any ambiguities between these terms and conditions and any terms and conditions contained in a quotation, order acknowledgement, or other Flow-issued documents (for conflict between Flow's terms and Buyer's terms, see Section 15(a) above), the following order of priority shall apply: (i) terms on the order acknowledgement (if any), (ii) terms on the quotation, (iii) these terms and conditions.

f.   **Waiver.** The failure of Flow to object to any provision in conflict with the Agreement shall not be construed as a waiver of any of this Agreement, and the failure of Flow to enforce any of the provisions of this Agreement shall not be construed in any sense as a waiver.

g.   **Third Party Beneficiaries.** The parties do not intend that the Agreement shall create a right of enforcement by any third party and the parties expressly intend that there be no third parties with standing to enforce any provision of the parties' Agreement. In the event Buyer obtains funding from a third party or Flow enters into any agreement with such financier, Buyer agrees that Buyer shall have no rights as a third-party beneficiary in any contract between Flow and that third party.

h.   **Liens.** The Buyer shall not allow the Equipment to become subject to any lien or encumbrance, including but not limited to a mechanic's lien, without the express, written permission of Flow. If the Buyer violates this provision, it shall be responsible immediately to take all steps necessary to remove or satisfy any such lien and to pay all reasonable legal fees and costs incurred by Flow as a result of the imposition of such a lien.

i.   **Severability.** Any determination that a provision of this Agreement is unenforceable will not affect the enforceability of the remaining provisions of this Agreement

Flow International Corporation
23500 64th Avenue South Kent, Washington 98032 USA
tel 253.850.3500 | toll-free 800.446.3569 | fax 253.813.9377
FlowWaterjet.com



# EXHIBIT B

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


RUIZ FAJARDO INGENIEROS ASOCIADOS )
S.A.S., a foreign corporation,    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )   No. 2:16-CV-01902-RAJ
                                  )
FLOW INTERNATIONAL CORPORATION, a )
Delaware corporation,             )
                                  )
            Defendant.            )


TELECONFERENCE DEPOSITION OF TULIO RUIZ
30(b)(6)

Sepember 28, 2018

Seattle, Washington



Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com



Serving Washington's Legal Community since 1980

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

```
 1   A    Correct.  There was no way of doing or knowing the

 2        times.  This is a machine where the price we're going to

 3        give to a client depends on the time.  We sell and buy

 4        by the second.  And we were told that it would put the

 5        program and table with data, it would put it in the

 6        machine like that, we would get what the real cost and

 7        we would get a precise quote.

 8             But the problem was once we put the program in the

 9        machine, the real -- or the actual cutting times were

10        completely different from the estimated times.

11   Q    Okay.  So let me ask this question, sir, just to make

12        sure we have a clear understanding:  What are the issues

13        that Ruiz Fajardo is claiming arose from the software?

14        And if you could just list them, we can explore in more

15        detail later.

16   A    From the very beginning, the times that the desk

17        computer would produce were completely different from

18        the actual cutting times.  Always.

19             The startup and the stop of the machine never

20        worked properly.  And why?  Because the same problem

21        with the software.  The computer would tell the machine

22        to start and stop when we were not telling the machine

23        to do that.

24             In some jobs -- for example, let's say some cuts

25        where we needed a slanted cut, it would start with a
```

```
1    A    They didn't provide any training in 3D because the
2         machine wasn't working in 3D.  The machine wasn't even
3         working in 2D, so what kind of training were they going
4         to give us?
5    Q    So it's Ruiz Fajardo's testimony, then, that nobody from
6         Flow came in October 2014 to provide any training to any
7         Ruiz Fajardo personnel at the factory; correct?
8    A    No, that's not correct.  They came and they give us
9         training on axes X and J.
10   Q    In October twenty --
11   A    But they could never give us training in 3D because the
12        machine wasn't working.
13   Q    So is it your testimony, then, that Flow did come in
14        October 2014 but did not provide 3D training?
15   A    Correct.
16   Q    Okay.  Now, you were listing out all of the issues
17        caused by the software, according to Ruiz Fajardo.
18             Was there anything else left on that list that you
19        have not yet identified?
20   A    To me, the main problem was always the software.  The
21        software was never compatible with the machine until
22        last year.  And last year when the software was
23        installed and the changes were made -- needed by the
24        machine, and since then the machine has been working.
25        The machine has been working -- doing work in X and J.
```

1   A   The administration of the whole business.  Everything.

2       I take care of the business part, the finance part.  I

3       take care of everything in the business.  The business

4       has administration department, sales department.  I'm in

5       charge of all of that.

6   Q   What is Germán Fajardo's role?

7                       THE INTERPRETER:  May the interpreter

8       inquire here again?

9                       MR. ESCOBAR:  Sure.

10                      THE INTERPRETER:  Are we talking --

11      because this have come up before.  (Speaking in Spanish)

12      used as only sales, not only the business.  That's why

13      the interpreter was asking for clarification.

14          And the response was that he is in charge of sales

15      and the engineering part, he's a mechanical engineer.

16  Q   (By Mr. Escobar)  Has Germán Fajardo ever operated the

17      Flow machine?

18  A   Never.

19  Q   Okay.  I want to talk now for a little bit about the

20      purchase of the Flow machine.  Okay?

21  A   Okay.

22  Q   What was your role in connection with the purchase of

23      the machine?

24  A   It was me who carried out the negotiation because it was

25      me who first met Javier Gómez.  He was the one offering

1        the machine to me at an international trade fair taking

2        place in Colombia.

3            I was looking for a laser cut machine, but he

4        offered me the waterjet cutting machine that offered

5        better performance than the laser cut machine -- or the

6        laser cutting machine.

7    Q   Okay.  So you had this initial conversation with

8        Mr. Gómez at the trade fair in Colombia; correct?

9    A   Correct.

10   Q   When was that?

11   A   Five years ago, six years ago.  Six years ago.

12   Q   How long before you signed the contract to purchase the

13       machine did this international trade fair occur?

14   A   Very short period of time.  Like two or three months.  I

15       don't remember exactly.  About two, three months.

16   Q   Okay.  So if you signed the contract, and we'll look at

17       it shortly, in November 2012, then is it reasonable to

18       assume that the fair occurred sometime in 2012?

19   A   It was sometime in 2011, 2012.  I don't remember, but

20       after that, we talked for several months.  And then he

21       invited me to Seattle to go and check out the machine in

22       Seattle.  But the machine there was completely different

23       from the machine that they sent me.

24   Q   Okay.  Let's focus on this initial meeting, though, at

25       the trade fair.

```
1   Q   Okay.  And who gave the demo to you?
2   A   I don't know the names.  The technicians they had there.
3   Q   Was Mr. Gómez there with you?
4   A   He was always with me.
5   Q   If there was an English conversation, who translated it
6       to you in Spanish?
7   A   He was the one that would translate the conversation
8       into Spanish.  He is Spanish and translate it into
9       English.
10  Q   Okay.  So you have the two-day visit to the Seattle
11      factory -- Seattle facility for Flow.
12          Have you told me everything you remember about that
13      visit?
14  A   Yes.  And the result of that visit was that I bought the
15      machine.
16  Q   Okay.  When was that visit?
17  A   I don't remember.
18  Q   Did you sign the contract that day during the visit --
19      during the second day of the visit?
20  A   Yes.
21  Q   So let's take out the contract.
22              MR. ESCOBAR:  Daniel, can you take out
23      Tab 6, please?
24          It's Exhibit 6.
25              MR. NELSON:  Oh, is it?  I thought it
```

```
 1          was 2.

 2                  Is the contract 2, Jesse?

 3                          MR. ESCOBAR:  Oh, is it 2?

 4                          THE INTERPRETER:  6?

 5                          MR. ESCOBAR:  It is 2.  You were

 6          right.  I wrote the wrong number down in the binder.

 7                  Don't quote me on that, James, but you're right.

 8    Q     (By Mr. Escobar)  Mr. Ruiz?

 9    A     Sir.

10    Q     You have before you a document that's been marked as

11          Exhibit 2 at an earlier deposition.

12                  Have you seen this before?

13    A     This one?  Yes, of course.

14    Q     What is it?

15    A     This is a purchase receipt of the machine or sale of the

16          machine.

17    Q     On the first page; right?

18    A     Yes.

19    Q     How many pages is the document you have?

20    A     Twenty-six.

21    Q     Okay.  So the rest of the document is the contract;

22          correct?

23    A     Yes.  Here we have everything that we were offered.

24    Q     Okay.  And did you -- that's your signature on -- if you

25          look at the top it says Page 5 of 27 in the upper right.
```

```
 1        reviewed the contract in detail before signing it;

 2        correct?

 3   A    What did you say?

 4   Q    Sure.

 5            During that same day that you negotiated the deal,

 6        you also reviewed the contract before signing it;

 7        correct?

 8   A    Reviewed with Javier where they were asking me to sign,

 9        these two pages, what I was buying was this.  These are

10        the three pages I signed.  All of these other documents,

11        Javier had sent them to me way before.

12   Q    Okay.  Which documents had Javier sent you way before?

13        Can you just show me the pages, please?

14   A    The technical specifications, all the technical

15        specifications of the machine, for the additional

16        cutting equipment it has, the additional cleaning and

17        painting equipment.

18   Q    Can you just -- given that we have the document here,

19        can you please tell me specifically what pages in this

20        document had been previously sent to you?

21   A    From Page 6 to 27.

22   Q    So from Page 6 of 27 until the end of the document;

23        correct?

24   A    Sorry.  Sorry.  Sorry.  No.  6 to 23.

25   Q    Okay.  Now, these are in English.
```

```
 1                        THE WITNESS:  Ma'am?
 2    Q    (By Mr. Escobar)  Pages 6 to 23 are in English.
 3              Did you translate them, or did you receive a
 4         translated copy from Mr. Gómez?
 5    A    We had a translator here.
 6    Q    Who did it?  Who did the translation?
 7    A    One of the engineers of the company.  I think Jaime.
 8    Q    Okay.  So you knew what it said, Pages 6 through 23,
 9         before you signed the contract; correct?
10    A    Yes.  Basically between 6 and 23 is talking about the
11         components of the machine, the things that the machine
12         can do, and the things that the machine doesn't do.
13    Q    Well, you read through all of those pages before you --
14         at some point before you signed the contract; correct?
15    A    Yes.  We saw that here.  Javier had given them to me way
16         before.  I think Javier gave the pages to me at the
17         trade fair, if I'm not mistaken.
18    Q    Okay.  So you had --
19    A    This is all the components of the machine, all the
20         physical components of the machine.  And if you look at
21         it, you see that there's no mention to the software
22         anywhere.
23    Q    So you also read through Pages 24 through 27 before you
24         signed the contract; correct?
25    A    Yes.
```

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1   Q     Did you read it in both English and Spanish?

2   A     No.  From 24 to 27, no.  These were sent later to me by

3         Javier.  24 to 27, no.

4   Q     It's your testimony under oath that you did not see

5         Pages 24 to 27 before you signed the agreement?

6   A     I had not seen them.

7   Q     You had not seen them at all?

8   A     At that time I hadn't seen them.

9   Q     Okay.  But you saw them long before May 1st, 2013;

10        correct?  Before May of 2013 -- but you saw Pages 24 to

11        27 long before May of 2013; correct?

12  A     24 to 27, no.  I had seen from Page 6 to 23.  From

13        Page 6 to 23 I saw them way before I think Javier showed

14        them to me at the trade fair.

15  Q     Okay.  Let's try it this way:  When did you first see

16        Pages 24 to 27?  And specifically these pages entitled

17        Terms and Conditions.

18  A     When they send the invoice together with the negotiation

19        document and the general sales terms, when they send me

20        those, they also send me the terms and conditions.

21  Q     And when did they send you all of this paperwork that

22        you just mentioned?

23  A     Those documents were sent to me after January 5th of

24        2013 to make the payment.

25  Q     Okay.  And so you received them in January of 2013;

1           correct?

2                              THE WITNESS:  Yes, ma'am.

3      Q    (By Mr. Escobar)  And then you made the payment after?

4      A    Yes, the payment was done later.  To be able to make the

5           payment, we needed this document.  The bank requested

6           it.

7      Q    Okay.  So the paperwork arrives with these terms and

8           conditions.  You review them and then you make the

9           payment to the bank afterwards; correct?

10                             THE WITNESS:  Yes, ma'am.

11     Q    (By Mr. Escobar)  When you reviewed these terms and

12          conditions on Pages 24 to 27, did you have them

13          translated?

14     A    Can you repeat the last thing?

15               Yes.  We had that translated because the bank, to

16          be able to transfer the money, was requesting the terms

17          and conditions.  So we translated them because the bank

18          requested them.

19     Q    Okay.  And then you specifically, Tulio Ruiz, reviewed

20          the translated terms and conditions before agreeing to

21          have the money sent as part of the bank transaction to

22          purchase the machine; correct?

23                             THE WITNESS:  Yes, ma'am.

24     Q    (By Mr. Escobar)  And you had the opportunity, if you

25          had any questions, to ask them of Flow before you agreed

```
 1   A      Yes, I have it here.
 2   Q      "Flow breached its contract with Ruiz Fajardo.  Flow
 3          also breached its warranty to Ruiz Fajardo."
 4   A      Yes.  They haven't given me the warranty.
 5   Q      The warranty that is referenced in this paragraph is the
 6          warranty that is in the contract; correct?
 7   A      Yes.
 8   Q      And that --
 9   A      Two years.
10   Q      Correct.
11                And I understand -- you know, I'm not going to ask
12          you about the application of it or interpretation, but I
13          just wanted to be clear that that is the warranty that's
14          referenced here upon which Ruiz Fajardo is basing its
15          claims; correct?
16   A      Yes, because that was the two-year warranty that was
17          going to start once I got the machine.  The machine was
18          working, but they never delivered a machine that was
19          working.
20          Why would I buy a machine if the machine is just
21          going to be sitting there and if the machine -- I need
22          the machine to be working.
23   Q      Sir, I understand your --
24   A      I bought the machine in 2013.  Now it is 2018.  At the
25          end of 2017, they got the machine to work, but it's not
```

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

```
 1        on how to use the machine?
 2   A    If I personally what?
 3   Q    Ever received any training on how to use the machine?
 4   A    No.  Personally, no.  That I kind of, like, passed by
 5        while in some room they were doing the training, yes.
 6        But I myself received any training, no.
 7   Q    Ruiz Fajardo never sent any of its employees to the
 8        United States to receive training on the machine;
 9        correct?
10   A    No.  In the negotiations and included in the package,
11        there was that they were going to train us at our
12        factory once the machine was installed.
13   Q    Correct.  But Ruiz Fajardo --
14   A    On one occasion Gilberto Romero and the engineer, Germán
15        Fajardo, were at the Seattle plant looking at the
16        machine before it was sent to Colombia.
17   Q    But they did not receive any training on the machine at
18        that point; correct?
19   A    No.  They explained how it worked.  But training per se,
20        no.
21   Q    And Ruiz Fajardo never sent any of its employees for
22        training anywhere outside of Colombia regarding the
23        machine; correct?
24   A    No.
25   Q    Okay.  Sir, can you look at the maintenance logs again,
```

1    STATE OF WASHINGTON   )    I, Michelle D. Elam, CCR,
                          )ss  a certified court reporter in
2    County of Pierce     )    the State of Washington, do
                               hereby certify:

3

4              That the foregoing deposition of TULIO RUIZ
     was taken before me and completed on September 28, 2018,
5    and thereafter was transcribed under my direction; that
     the deposition is a full, true and complete transcript
6    of the testimony of said witness, including all
     questions, answers, objections, motions and exceptions;

7

8              That the witness, before examination, was by
     me duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature.

10             That I am not a relative, employee, attorney
     or counsel of any party to this action or relative or
11   employee of any such attorney or counsel and that I am
     not financially interested in the said action or the
12   outcome thereof;

13             That I am herewith securely sealing the said
     deposition and promptly delivering the same to Attorney
14   Andrew R. Escobar.

15             IN WITNESS WHEREOF, I have hereunto set my
     signature on the 5th day of October, 2018.

16

17              _____
                Michelle D. Elam, RPR, CCR
18              Certified Court Reporter 3335

19

20

21

22

23

24

25

# EXHIBIT C

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


RUIZ FAJARDO INGENIEROS ASOCIADOS )
S.A.S., a foreign corporation,   )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )   No. 2:16-CV-01902-RAJ
                                 )
FLOW INTERNATIONAL CORPORATION, a )
Delaware corporation,            )
                                 )
            Defendant.           )


DEPOSITION OF JAVIER GÓMEZ

Sepember 14, 2018

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com



Serving Washington's Legal Community since 1980

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

```
1              Did you ever plug any weep holes that the machine
2        had?
3                        MR. ESCOBAR:  Maybe block.
4                        THE WITNESS:  No.
5                        THE INTERPRETER:  Okay.  So it's a
6        hole where water comes out; correct?
7                        MR. ESCOBAR:  Correct.
8                        THE INTERPRETER:  Okay.  I found
9        something else.
10   Q    (By Mr. Escobar)  What type of hydraulic oil did you use
11        for the intensifier pump?
12   A    The one that the machine came with originally.  There
13        was no oil replacement because the amount of hours
14        didn't grant it.
15   Q    So you never replaced or changed the hydraulic oil;
16        correct?
17   A    No, sir.
18   Q    Can you walk me through the process that you used every
19        time you turned the machine on?
20   A    First of all, it was verified that everything was
21        working or was in the correct position, like the water
22        line, the air.  Then the water went inside the machine,
23        and it was done in the same direction as the machine.
24              And from the beginning we had a problem with the
25        starting of the machine.  It didn't start correctly.
```

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1          **The machine was supposed to start from Flow MC,**

2          **according to Ulises Muñoz who installed the machine.**

3              **It was verified through Flow MC that all of the**

4          **servo engines were turned on, but we had to manually**

5          **turn on the engines.**

6    Q    When Mr. Muñoz provided the initial training session

7         after the machine was installed, he turned on the

8         machine and showed you how to use it; correct?

9    A    **Correct.**

10   Q    Okay.  And he used that machine for that training

11        session for those two to three days; correct?

12   A    **He explained that in the machine, because the table**

13        **computer does not have that software.**

14   Q    And eventually a workaround was provided so that the --

15        to address that issue; correct?

16   A    **Correct.**

17   Q    Okay.  What email address did you use to communicate

18        while you were employed by Ruiz Fajardo?

19   A    **Waterjet@ruizfajardo.com.**

20   Q    Did you ever use produccion@ruizfajardo.com?

21   A    **No, sir.**

22   Q    Did you ever use your personal email address?

23   A    **Yes, sir.**

24   Q    What email address is that?

25   A    **Javigp21@hotmail.com.**

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1    part was performed.

2    Q    Okay.  Approximately -- let's strike that.

3         Did you ever try to cut stacks of material using

4    the machine?

5    A    Yes, sir.

6    Q    Approximately how thick were the stacks of material?

7    A    It depended.  We used different material thickness.

8    Q    Did the stacks ever exceed 5 centimeters or more in

9    thickness?

10   A    I'm not sure.

11   Q    Are you aware of any time that Ruiz Fajardo ever told

12        Flow that it wanted to send the machine back?

13   A    No, sir.

14                   MR. ESCOBAR:  Why don't we take a

15        short break.  Five minutes.

16                        (Recess from 11:14 a.m. to

17                        11:24 a.m.)

18                   MR. ESCOBAR:  Mr. Gómez, I want to

19        thank you for your time and making yourself available

20        for questions today.

21        Unless the company lawyer has any follow-up

22        questions, then I am done.

23        Thank you.

24   ///

25   ///

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

```
1                    EXAMINATION
2        BY MR. NELSON:
3    Q   Mr. Gómez, my name is James Nelson, and I'm the United
4        States attorney for Ruiz Fajardo.
5    A   My pleasure.
6    Q   First of all, thank you for being here today.  I just
7        have a few questions to follow up on Mr. Escobar's
8        questions.
9    A   Correct.
10   Q   You said that Mr. Muñoz taught you a manual technique to
11       start the machine?
12   A   Yes, sir.
13   Q   How well did the workaround work?
14   A   Very badly.
15   Q   Would you tell me in your own words about that?
16   A   It was random.  Sometimes turning on the machine would
17       take us eight hours.  Many times it would just get
18       blocked and we were not allowed to turn on the machine,
19       to turn on the engines, the motors.  And some other
20       occasions it's past one full day without the machine
21       getting on.
22           And due to this, several emails were sent in
23       different occasions requesting help and technical
24       service to be able to perform the cutting services.
25   Q   How long did you have to turn on the machine manually?
```

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1    A    **So turning the machine on manually, if it responded, it**

2         **could be fast, 10 minutes.  But it not, as I already**

3         **said, it could be up to two hours -- eight hours.**

4                          THE INTERPRETER:  The interpreter

5         changes the answer.

6    Q    (By Mr. Nelson)  Mr. Gómez, how long did this problem

7         persist?

8    A    **Until last year, 2017.**

9    Q    So if you used the machine, you had to turn it on

10        manually for three years?

11   A    **Correct.**

12   Q    Mr. Gómez, when this problem first occurred, I believe

13        you testified that Mr. Muñoz from Flow said it was a

14        software problem?

15   A    **Yes, sir.**

16   Q    Would you tell me more about that conversation with

17        Mr. Muñoz?

18   A    **What he said is that at the time, he didn't have a way**

19        **of solving the problem; that he didn't know what caused**

20        **the problem.  That's why he opted to teach us the manual**

21        **way of turning on the motors.**

22   Q    Did Mr. Muñoz say that software was missing?

23   A    **Yes, sir.  Regarding the simulation times for the**

24        **machine when -- for cutting times.**

25   Q    Okay.  Mr. Gómez, would you tell me in your own words

1    that we could start cutting one day, stop it and

2    continue the following day.  But at this point, the

3    machine would lose the home, so the starting point was

4    not precise to reprieve with the cut where it had been

5    left off.

6         And then to find the starting point again, it was a

7    tedious task that could take up to two or three hours to

8    find a point where to continue from.

9  Q  How long, Mr. Gómez, did this problem of losing the home

10    coordinates go on?

11 A  **Approximately three years.**

12                    MR. NELSON:  I have no further

13    questions, sir.

14         Thank you very much for your time.

15                    **THE WITNESS:  My pleasure.**

16                    MR. NELSON:  Have a great day.

17                    **THE WITNESS:  Very kind.**

18

19                    FURTHER EXAMINATION

20    BY MR. ESCOBAR:

21 Q  Mr. Gómez, I just have a follow-up question or two.

22         When did that homing issue you just described to

23    Mr. Nelson first become noticed by you?

24 A  **From the beginning when the machine was installed.  It**

25    **was not constant.  It could be yesterday, now tomorrow.**

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1          It depend.  It varied.

2              So following Mr. Ulises Muñoz's instructions, we

3          put some marks on the rails and a mark on the portico

4          frame to signal the -- where the zero axis would be

5          positioned.  And sometimes if the machine stopped

6          working, we would reposition it manually.

7    Q   So during that initial two- to three-day training

8          session that Mr. Muñoz gave that you testified to

9          earlier when the machine was first installed, this

10         homing issue was not -- did not present itself; correct?

11   A   It was there all the time.

12   Q   So you're testifying that it was there during the --

13         that training session that Mr. Muñoz gave at the

14         beginning?

15   A   No, no, sir.

16   Q   So it was only after the installation and that training

17         session that you noticed this; correct?

18   A   Yes, at the time I started operating the machine.

19             MR. ESCOBAR:  No further questions.

20         Thank you.

21         We're done.

22             MR. NELSON:  We're done.

23             (Signature reserved.)

24             (Deposition concluded at

25             11:40 a.m.)

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

```
 1    STATE OF WASHINGTON   )    I, Michelle D. Elam, CCR,
                            )ss  a certified court reporter in
 2    County of Pierce      )    the State of Washington, do
                                 hereby certify:

 3

 4              That the foregoing deposition of JAVIER GÓMEZ
      was taken before me and completed on September 14, 2018,
 5    and thereafter was transcribed under my direction; that
      the deposition is a full, true and complete transcript
 6    of the testimony of said witness, including all
      questions, answers, objections, motions and exceptions;

 7

 8              That the witness, before examination, was by
      me duly sworn to testify the truth, the whole truth, and
 9    nothing but the truth, and that the witness reserved the
      right of signature;

10              That I am not a relative, employee, attorney
      or counsel of any party to this action or relative or
11    employee of any such attorney or counsel and that I am
      not financially interested in the said action or the
12    outcome thereof;

13              That I am herewith securely sealing the said
      deposition and promptly delivering the same to Attorney
14    Andrew R. Escobar.

15              IN WITNESS WHEREOF, I have hereunto set my
      signature on the 21st day of September, 2018.

16

17              _____
                Michelle D. Elam, RPR, CCR
18              Certified Court Reporter 3335

19

20

21

22

23

24

25
```

**EXHIBIT D**

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


RUIZ FAJARDO INGENIEROS ASOCIADOS )
S.A.S., a foreign corporation,    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )   No. 2:16-CV-01902-RAJ
                                  )
FLOW INTERNATIONAL CORPORATION, a )
Delaware corporation,             )
                                  )
            Defendant.            )


DEPOSITION OF CÉSAR CORTÉS CAMACHO

Sepember 13, 2018

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com



Serving Washington's Legal Community since 1980

1        these tasks?

2    A   Some of them.  I know that they are not authorized to do

3        interventions -- make interventions on the machine.

4    Q   Sure.  But for the items here that are listed, were

5        they -- were those the two individuals that were in

6        charge?

7    A   Yes.

8    Q   Did you ever have any problems with the machine when you

9        used it?

10   A   Yes.

11   Q   What problems did you have when you used it?

12   A   Well, making a cut.  The machine would suspend the

13       cutting.  It would be stuck.  And several times during

14       the cutting process would lose the home, so it was

15       necessary to set it up again.

16           And then there was a mistake in the same piece

17       because of the location of the home.

18   Q   Okay.  Anything else?

19   A   And sometimes the machine would not cut the piece in the

20       whole length that was supposedly prepared for and during

21       the cutting process, occasionally would go back by

22       itself to the home position, and that would make it

23       possible to crash against an object.

24   Q   Okay.  Anything else?

25   A   The times that the machine would calculate when doing

Byers & Anderson Court Reporters
253.627.6401 | production@byersanderson.com

1    simulations, even on the computer on the machine, were

2    different from the real times when you were doing the

3    process.

4  Q    Okay.  Anything else?

5  A    Not that I remember.

6  Q    Okay.  When did you first notice these problems?

7  A    As soon as we started working with the machine.

8  Q    And that's true for all of these problems you've just

9       identified?

10 A    Yes.

11 Q    After you noticed that these problems were occurring,

12      what did you do?

13 A    We requested support to Flow.

14 Q    And did you communicate the request to support or did

15      someone else?

16 A    I know that sometimes I did it myself and in other

17      occasions there were conversations with Tulio and

18      German.

19 Q    When you made the request for support to Flow, did you

20      do it by telephone or by email?

21 A    By email.

22 Q    Always email?

23 A    Yes.  And after Juan Carlos from RexcoTools came, we had

24      some phone conversations with him.

25 Q    And when you discussed the problems with Tulio or

```
 1    STATE OF WASHINGTON   )    I, Michelle D. Elam, CCR,
                            )ss  a certified court reporter in
 2    County of Pierce      )    the State of Washington, do
                                 hereby certify:
 3

 4           That the foregoing deposition of CÉSAR CORTÉS
      CAMACHO was taken before me and completed on
 5    September 13, 2018, and thereafter was transcribed under
      my direction; that the deposition is a full, true and
 6    complete transcript of the testimony of said witness,
      including all questions, answers, objections, motions
 7    and exceptions;

 8           That the witness, before examination, was by
      me duly sworn to testify the truth, the whole truth, and
 9    nothing but the truth, and that the witness reserved the
      right of signature;
10
             That I am not a relative, employee, attorney
11    or counsel of any party to this action or relative or
      employee of any such attorney or counsel and that I am
12    not financially interested in the said action or the
      outcome thereof;
13
             That I am herewith securely sealing the said
14    deposition and promptly delivering the same to Attorney
      Andrew R. Escobar.
15
             IN WITNESS WHEREOF, I have hereunto set my
16    signature on the 20th day of September, 2018.

17                       _Michelle D. Elam_____

18                       Michelle D. Elam, RPR, CCR
                         Certified Court Reporter 3335
19

20

21

22

23

24

25
```

# EXHIBIT E

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

RUIZ FAJARDO INGENIEROS ASOCIADOS )
S.A.S., a foreign corporation,     )
                                   )
          Plaintiff,               )
                                   )
    vs.                            ) No. 2:16-CV-01902-RAJ
                                   )
FLOW INTERNATIONAL CORPORATION, a )
Delaware corporation,              )
                                   )
          Defendant.               )

DEPOSITION OF CHARLES MATTHEW WAKEFIELD

September 19, 2018

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com

Serving Washington's Legal Community since 1980

1               THE WITNESS:  Okay.

2               MR. ESCOBAR:  -- before responding.

3    Q   (By Mr. Nelson)  I was reading this morning the report

4        that was generated after the next visit, the July 2017

5        visit.  And somewhere it said that the -- they had found

6        that the inlet water pressure sensor had been disabled.

7            Do you know anything about that?

8    A   **I'm not aware that the sensor was disabled.**

9    Q   Okay.  So you didn't see that it -- was it March or May?

10       I forget.

11   A   **We did not.**

12   Q   Okay.  Let's digress.

13           Tell me about your visit in the spring of 2017 to

14       Ruiz Fajardo in Colombia.

15   A   So what specifically --

16   Q   Well, who went from Flow?  Just tell me what you

17       remember.

18   A   Okay.  So myself and our subject matter expert field

19       service engineer from North America, Andrew Czernota --

20               (Reporter requests

21               clarification.)

22           THE WITNESS:  Andrew Czernota.  I'm

23       not even sure -- C-z something --

24               MR. ESCOBAR:  C-z-e-r-n-o-t-a.  If

25       not, we can get the spelling later.

```
1        Mischaracterizes the witness's testimony.

2                    THE WITNESS:  Can you ask the question

3        maybe a different ...

4   Q    (By Mr. Nelson)  You can just answer the one I asked.

5   A    Can you repeat it, then?

6   Q    So it's your understanding that the customer wanted to

7        start it through Flow MC?

8                    MR. ESCOBAR:  Same objection.

9                    THE WITNESS:  I do not think they

10       wanted to do that.

11  Q    (By Mr. Nelson)  Okay.  Do you think it was

12       inappropriate for them to do what Flow's technician

13       recommended?

14                   MR. ESCOBAR:  Object to form.

15                   THE WITNESS:  No.  It was a workaround

16       provided to them.

17  Q    (By Mr. Nelson)  And to your knowledge, when was the

18       problem corrected such that the workaround was no longer

19       needed?

20  A    I believe it was the July, August visit when we came

21       back down there to do the -- all of the upgrades.  And

22       that was addressed through new software and advanced

23       training.

24  Q    Okay.  So nobody had taught them how to start the

25       machine on FlowCut the way the manual recommends or
```

1  STATE OF WASHINGTON )  I, Michelle D. Elam, CCR,
           )ss a certified court reporter in
2  County of Pierce   )  the State of Washington, do
               hereby certify:

3

4      That the foregoing deposition of CHARLES
  MATTHEW WAKEFIELD was taken before me and completed on
5  September 19, 2018, and thereafter was transcribed under
  my direction; that the deposition is a full, true and
6  complete transcript of the testimony of said witness,
  including all questions, answers, objections, motions
7  and exceptions;

8      That the witness, before examination, was by
  me duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and that the witness reserved the
  right of signature;

10

11      That I am not a relative, employee, attorney
  or counsel of any party to this action or relative or
  employee of any such attorney or counsel and that I am
12  not financially interested in the said action or the
  outcome thereof;

13

14      That I am herewith securely sealing the said
  deposition and promptly delivering the same to Attorney
  James D. Nelson.

15

16      IN WITNESS WHEREOF, I have hereunto set my
  signature on the 26th day of September, 2018.

17

18         _____
         Michelle D. Elam, RPR, CCR
         Certified Court Reporter 3335

19

20

21

22

23

24

25

**EXHIBIT F**



Flow International Corporation Argentina Branch
Dom. Legal Reconquista 1088 P. 9, CP 1088, CABA
Dom. Comercial Colectora Panamerica 2011 Oficina 202
Boulogne B1609JVB Provincia de Bs.As.
Telefóno +54 11 4700 8881 / +54 11 4700 8882
CUIT 30-69732816-1
www.flowcorp.com

**ORIGINAL**

**F l o w**

Cliente:                                    RUIZ FAJARDO                      Fecha: 11 al 24 -Septiembre-2013

Equipo/Modelo:                          MACH4C                HYP87100HP

Número de Serie Sistema XY:

Número de serie Bomba:

Horas de Bomba:

Tipo de Servicio:                   SERVICIO  INSTALACION

## Comentarios, piezas sustituidas y recomendaciones:

Se instalan bases, se nivelan, anclan y ajustan las bases de la maquina, se monta puente y conecta con las bases

Se conecta bomba y control y se energiza la maquina , se hace alineacion laser y se pone tabla de compensacion

Se realiza ajuste con balibar y ajusta el mismo, se prueban movimientos y se ajustan guias y cremalleras

Se coloca tanque en posicion y se comienza a llenar, se deja hasta este punto la inst. para que continuara Ulises.

| | Lunes | Martes | Miercoles | Jueves | Viernes | Sabado | Horas Semana |
|---|---|---|---|---|---|---|---|
| Horario Ingreso | | | Viaje | 07:30 | 07:30 | 07:30 | |
| Horario Salida: | | | Viaje | 17:00 | 17:00 | 17:00 | |
| **Horas x dia:** | | | | 9.5 | 9.5 | 9.5 | 28.5 |
| Horario Ingreso | 07:30 | 07:30 | 07:30 | 07:30 | 07:30 | 08:00 | |
| Horario Salida: | 17:00 | 17:00 | 18:30 | 24:30 | 19:30 | 19:30 | |
| **Horas x dia:** | 9.5 | 9.5 | 11.0 | 17.0 | 12.0 | 11.5 | 70.5 |
| Horario Ingreso | 07:30 | Viaje | | | | | |
| Horario Salida: | 18:30 | Viaje | | | | | |
| **Horas x dia:** | 11.00 | | | | | | 11.0 |

**Horas totales Habiles: 89.00**
**Horas totales Sabado: 21.00**
Km recorridos:

Gerardo Gasca
Técnico Responsable
Firma  y Aclaración

Responsable Instalación
Firma  y Aclaración

# EXHIBIT G



# Supplemental Economic Damages Report

## *Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow International Corporation*

Prepared by: David Solis, MSF, CVA, MAFF

Date of Report: October 12, 2018



October 12, 2018

Mr. James Nelson
Betts, Patterson & Mines, P.S.
One Convention Place
701 Pike Street, Suite 1400
Seattle, WA 98101-3927

RE: *Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow International Corporation*

Dear Mr. Nelson:

Solis Financial Forensics LLC was asked to prepare a supplemental report in regard to the above-referenced matter. I was provided with and asked to evaluate additional information, subsequent to issuance of my report dated March 20, 2018. This supplemental report should be considered and read as an extension of my March 20, 2018 report. I have updated my conclusions and determined the economic damages resulting from the defective waterjet cutting system to total:

**$1,007,495 to $1,093,839 Under Breach of Contract**

**Or**

**$1,120,181 to $1,625,204 Under Rescission**

The details regarding my updated evaluation of the economic damages are summarized on the subsequent pages of this report. Attached to this report are all exhibits contained in my March 20, 2018 report, as some exhibits have been updated.

Sincerely,

David Solis, MSF, CVA, MAFF
Managing Member
Solis Financial Forensics LLC

Mr. James Nelson
RE: *Ruiz Fajardo v. Flow International*
October 12, 2018

# TABLE OF CONTENTS

VI. Additional Information Provided ........................................................................................... 3

VII. Supplemental Analysis ..................................................................................................... 3

   Economic Damages Under Breach of Contract ...................................................................... 3

   Economic Damages Under Rescission..................................................................................... 4

   Economic Damages Using Alternate Currency Conversion Methodology ............................. 5

VIII. Updated Conclusion ....................................................................................................... 5

Curriculum Vitae....……………………………………………………………………Exhibit A

Testimony History..……………………………………………………………………Exhibit B

Fee Schedule……...……………………………………………………………………Exhibit C

Analysis Schedules……………………………………………………………………Exhibit D



Mr. James Nelson
RE: *Ruiz Fajardo v. Flow International*
October 12, 2018

# VI. ADDITIONAL INFORMATION PROVIDED

I was provided with the following information subsequent to issuance of my March 20, 2018 report:

- Notice of Deposition of David Solis dated April 11, 2018
- Rough draft transcript of deposition of Claudia Gomez
- Transcript of deposition of Tulio Ruiz dated September 28, 2018
- Excel file titled "Bitacora cortes waterjet 2017"
- Excel file titled "Bitacora cortes waterjet 2018"
- Rebuttal Report of Lorraine Barrick, CPA/ABV/CFF, ASA, CFE dated April 30, 2018

# VII. SUPPLEMENTAL ANALYSIS

I analyzed the additional information provided in conjunction with my March 20, 2018 report, to determine the effect, if any, of the additional information on the opinions stated in my March 20, 2018 report. I also updated all parts of my analysis to incorporate currency exchange rate data as of October 11, 2018. Attached to this supplemental report is Exhibit D which contains Schedules 1 through 13. Schedules 1 through 13 are identical to those contained in my March 20, 2018 report, with the exception of updated currency exchange rates and the changes described below.

## Economic Damages Under Breach of Contract

In my March 20, 2018 report, I assumed Ruiz Fajardo would have been capable of ramping up its waterjet cutting services operation and reaching normalized production and revenue levels by January 1, 2018. This assumption was based on my understanding that Flow attempted to repair the defective waterjet cutting system on July 17, 2017. Although the defective system was operational after the attempted repair, I understand it still exhibits issues which limit Ruiz Fajardo's ability to utilize it. Tulio Ruiz indicated the defective system still cannot do cuts of a certain length because it will crash, and that certain parts to the system which are supposed to last 200 hours do not last longer than 60 to 70 hours.[1]

Ruiz Fajardo provided detailed information regarding the defective system's performance during the years 2017 and 2018. It performed 145.4 hours of waterjet cutting services and generated revenue of $65,438,750 COP in 2017. The system performed 255.2 hours of waterjet cutting services and generated revenue of $122,486,000 COP from January 1, 2018 through September 19, 2018. These actual hours performed by the defective system are materially less than those originally projected by Ruiz Fajardo which range between 1,390 to 2,650 per year. Mr. Ruiz stated the following when asked about actual hours being less than those projected:

---

[1] Transcript of deposition of Tulio Ruiz dated September 28, 2018, p. 103.

 SOLIS

Mr. James Nelson
RE: *Ruiz Fajardo v. Flow International*
October 12, 2018

> *"Because all the potential clients and the clients that we managed to get, they left, they deserted us. We breached our agreement and people lost jobs and we lost credibility. And at this point we're starting to get it back."[2]*

Mr. Ruiz stated the following when asked if he would be able to achieve the waterjet cutting service hours projected in the business plan:

> *"Yes, but it would become like from the year we are now. It would go back to 2014."[3]*

I made the following changes to my calculations of lost profits:

- It's unclear when or if the defective system will be completely repaired and cease to exhibit the issues experienced by Ruiz Fajardo. However, I assumed that this would occur within one month of trial (January 28, 2019). Subsequent to complete repair of the defective system, I assumed Ruiz Fajardo would be capable of ramping up its waterjet cutting services operation and reaching normalized production and revenue levels by September 1, 2019.
- I incorporated actual waterjet cutting service revenues generated through September 2018.
- I assumed actual waterjet cutting service revenues earned during the year 2018 would be representative of revenues Ruiz Fajardo would earn through August 2019.
- Similar to the price increases in Ruiz Fajardo's business plan, I assumed price for waterjet cutting services would increase by 5% in 2019.
- I discounted future lost profits by Ruiz Fajardo's effective rate of return (19.28%).[4] I assumed a date of valuation of January 28, 2019.
- I utilized the currency exchange rate between U.S. dollars and Colombian pesos as of October 11, 2018 ($3,066.42 COP/USD) to convert total lost profits in Columbian pesos to U.S. dollars. I also assumed this conversion rate to represent future conversion rates.

My calculations are summarized on Schedule 3 and result in lost profits due to the defective waterjet cutting system of $3,056,372,497 COP. Utilizing the currency exchange rate as of October 11, 2018, the lost profits equate to $996,723 USD. Including extra expenses, the economic damages under breach of contract total $1,007,495, stated in U.S. dollars.

## Economic Damages Under Rescission

I updated the costs associated with the waterjet cutting system to include continuing costs through January 28, 2019 (the current date of trial). I also updated my calculations to include prejudgment interest through January 28, 2019.

---

[2] Transcript of deposition of Tulio Ruiz dated September 28, 2018, pp. 127 – 128.
[3] Transcript of deposition of Tulio Ruiz dated September 28, 2018, p. 128.
[4] Excel spreadsheets containing financial information for Ruiz Fajardo (Excel filed titled "Hoja de cálculo Rev 1_eng")



Mr. James Nelson
RE: *Ruiz Fajardo v. Flow International*
October 12, 2018

I made an error in my March 20, 2018 report and listed personnel and office equipment expenses to total $5,075,000 COP per month. It is actually $7,250,000 COP per month. I revised my analysis to include the correct cost amount.

My calculations are summarized on Schedule 2 and result in total economic damages under rescission of $1,120,181, stated in U.S. dollars.

## Economic Damages Using Alternate Currency Conversion Methodology

I updated my economic damages analysis utilizing the alternate currency conversion methodology, with the most current currency conversion data available. My alternate calculations under breach of contract are summarized on Schedule 1, and result in economic damages of $1,093,839, stated in U.S. dollars. The alternate calculations under rescission are summarized on Schedule 2, and result in economic damages totaling $1,625,204, stated in U.S. dollars.

# VIII. UPDATED CONCLUSION

I analyzed the information produced as of the date of this report, to evaluate the economic damages incurred by Ruiz Fajardo Ingenieros Asociados S.A.S., resulting from the defects of the waterjet cutting system purchased from Flow International Corporation. I conclude Ruiz Fajardo incurred economic damages under breach of contract totaling $1,007,495 or $1,093,839 (USD), depending on the methodology utilized to convert Columbian pesos to U.S. dollars. The economic damages under rescission total $1,120,181 or $1,625,204 (USD), depending on the methodology utilized to convert Columbian pesos to U.S. dollars. All opinions expressed in this report are made to a reasonable degree of professional certainty.

Sincerely,

David Solis, MSF, CVA, MAFF
Managing Member
Solis Financial Forensics LLC



## Schedule 3
## Projected Lost Profits from Waterjet Cutting Services
## Ruiz Fajardo Ingenieros Asociados

*(Currency values stated in Columbian pesos unless otherwise stated)*

**ASSUMPTIONS AND SOURCES OF DATA**

| | | |
|---|---|---|
| Projected Revenue But For The Defects | Column B | *Schedule 8* |
| Percentage Discount Applied to 2014 Revenues | 7% | *Ruiz Fajardo February 2013 business plan indicated a 6-8% initial discount* |
| Actual Revenue 2014 - 2016 | Column C | *Ruiz Fajardo responses to requests for financial information* |
| Actual Revenue 2017 - 2018 | Column C | *Excel files titled "Bitacora cortes waterjet"* |
| Saved Variable Expense Percentage | 55.29% | *Schedule 9* |
| Average Annual Exchange Rates | Column G | *OANDA exchange rates* |
| Discount Rate | 19.28% | *Excel filed titled "Hoja de cálculo Rev 1_eng"* |
| Mid-Year Discount Factor Applied to 2019 | 0.8251 | *Calculated as $(7/8)*(1 + Discount Rate)^{-(4/12)}$* |

**CALCULATION OF LOST PROFITS FROM WATERJET CUTTING SERVICES**

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Year | Projected Revenue But For Defects | Actual Revenue | Lost Revenue | Saved Variable Expenses | Lost Profits (COP) | Average Annual Exchange Rate | Lost Profits (USD) |
| | | | = B - C | = 55.29% x D | = D - E | | = F / G |
| 2014 | $ 577,356,016 | $ 6,360,000 | $ 570,996,016 | $ 315,686,475 | $ 255,309,540 | 1,988.65 | $ 128,383 |
| 2015 | $ 1,242,741,350 | $ 19,555,100 | $1,223,186,250 | $ 676,262,786 | $ 546,923,464 | 2,719.06 | $ 201,144 |
| 2016 | $ 1,304,878,550 | $ - | $1,304,878,550 | $ 721,427,994 | $ 583,450,556 | 3,029.62 | $ 192,582 |
| 2017 | $ 1,370,121,550 | $ 65,438,750 | $1,304,682,800 | $ 721,319,770 | $ 583,363,030 | 2,941.86 | $ 198,297 |
| 2018 | $ 1,028,718,522 | $ 122,486,000 | $ 906,232,522 | $ 501,028,629 | $ 405,203,893 | 2,892.58 | $ 140,084 |
| 2018 | $ 409,910,828 | $ 40,828,667 | $ 369,082,162 | $ 204,054,396 | $ 165,027,766 | 3,066.42 | $ 53,818 |
| 2019 | $ 1,510,560,818 | $ 108,876,444 | $1,401,684,373 | $ 774,949,014 | $ 517,094,248 | 3,066.42 | $ 168,631 |

Projected Lost Profits from Waterjet Cutting Services (COP) = **$3,056,372,497**

Currency Exchange Rate as of October 11, 2018 = 3,066.42

Projected Lost Profits from Waterjet Cutting Services (USD) = **$ 996,723**

Projected Lost Profits Calculated in USD = **$ 1,082,940**

