UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RUIZ FAJARDO INGENIEROS ASOCIADOS S.A.S., a foreign corporation, | NO. 2:16-CV-01902-RAJ |
| Plaintiff, | RUIZ FAJARDO'S OPPOSITION TO FLOW'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| vs. | |
| FLOW INTERNATIONAL CORPORATION, a Delaware corporation, | |
| Defendant. | NOTE ON MOTION CALENDAR: November 16, 2018 |
| | Oral Argument Requested |

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (2:16-CV-
01902-RAJ)

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND ......................................................................................................1
        A.      Ruiz Fajardo Purchased a Water Jet Cutting System to Start a New
                Business. ......................................................................................................1
        B.      The Flow System was Rife with Problems. ..................................................2
        C.      Flow Made Many Failed Attempts to Repair the System. ...........................4

III.    ARGUMENT AND AUTHORITY .......................................................................11
        A.      Summary Judgment Standard. ...................................................................11
        B.      Flow's Limited Warranty Failed of its Essential Purpose, Allowing Ruiz
                Fajardo to Recover Consequential Damages under Washington Law ..............11
        C.      Flow Mischaracterizes the Warranties Made to Ruiz Fajardo. .....................16
        D.      The Filing of this Lawsuit Constitutes Revocation of Acceptance. ...............20

IV.     CONCLUSION ......................................................................................................23

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- i -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 226, 797
    P.2d 477 (1990) .................................................................................. 12, 15, 18

*Aubrey's R.V. Center, Inc. v. Tandy Corp.*, 46 Wn. App. 595, 731 P.2d 1124
    (1987) ...................................................................................................20, 21, 22, 23

*Berg v. Stromme*, 79 Wn.2d 184, 484 P.2d 380 (1971) ..................................... 17, 18

*Cox v. Lewiston Grain Growers, Inc.*, 86 Wn. App. 357, 936 P.2d 1191 (1997),
    *review denied*, 133 Wn.2d 1020.................................................12, 15, 17, 18

*Fenton v. Contemporary Dev. Co., Inc.*, 12 Wn. App. 345, 529 P.2d 883 (1974) ............. 21, 22

*Rottinghaus v. Howell*, 35 Wn. App. 99, 666 P.2d 899 (1983) (citing *Berg v.
    Stromme*, 79 Wn.2d 184, 484 P.2d 380 (1971) ....................................... 17, 19

*Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 554 P.2d 349 (1976)....................22

## STATUTES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202
    (1986)...................................................................................11, 13, 14, 15

*Crane v. Conoco, Inc.*, 41 F.3d 547 (9th Cir. 1994) ............................................... 11

*Fiorito Bros., Inc. v Fruehauf Corp.*, 747 F.2d 1309 (1984) .............................. 13, 16

*Lewis Refrigeration v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427
    (6th Cir. 1983) ................................................................................................ 13

*Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951 (9th Cir. 1977)........................ 12

*Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703 (9th Cir. 1990)............. 12, 15, 16

*Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204 (W.D. Wash. 2018) ........................... 11

## OTHER AUTHORITIES

*McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 5 Ohio St. 3d 181, 449 N.E.2d
    1289 (1983) ..................................................................................................22

## REGULATIONS

RCW 62A.2-207 ....................................................................................................... 19

RCW 62A.2-315 ....................................................................................................... 17

RCW 62A.2-316 ....................................................................................................... 17

RCW 62A.2-606 ....................................................................................................... 11

RCW 62A.2-607(3) ................................................................................................... 11

RCW 62A.2-608 ....................................................................................................... 11

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- ii -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

RCW 62A.2-711, 712, 713, 716 ................................................................................ 11
RCW 62A.2-714 ....................................................................................................... 12
RCW 92A.2-719 ....................................................................................................... 12
U.C.C. § 2-719 ......................................................................................................... 13

**<u>10</u>**

Fed. R. Civ. P. 56(a) ................................................................................................ 11

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- iii -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

# I.   INTRODUCTION

Plaintiff Ruiz Fajardo Ingenieros Asociados S.A.S. ("Ruiz Fajardo") opposes Flow International Corporation's ("Flow") motion for partial summary judgment.  Flow's $437,830 state-of-the-art Mach 4 3D waterjet cutting system ("System") never worked because Flow sold it to Ruiz Fajardo long before Flow wrote adequate software to accommodate the Mach 4's advanced capabilities.  The software defects were so severe that Flow *abandoned* its efforts to repair Ruiz Fajardo's Mach 4 after months of abortive attempts.  This led to catastrophic consequences for Ruiz Fajardo.  In all, Ruiz Fajardo invested over $650,000 with virtually no return.  Ruiz Fajardo lost customers, revenue, reputation, and key employees.  (*See* Declaration of James D. Nelson ("Nelson Decl.") Exh. 1 at 12-13, 41-43.)  It also lost the advantage of being "first to market" in Colombia with a new technology.

First, Flow ignores pertinent Ninth Circuit and Washington precedent and argues that it should be able to *abandon* its contractual duties while escaping liability for consequential damages.  Second, Flow demands a premature ruling that would prevent it from being held accountable for the express warranties it made to Ruiz Fajardo before the System was purchased.  Third, Flow insists that its limited warranty expired *before* Ruiz Fajardo ever received a functioning System, despite continuing to provide parts and service to Ruiz Fajardo for nearly a year *after* it now asserts that the warranty ended.  Finally, Flow urges the Court to ignore years of demands from Ruiz Fajardo that Flow deliver a functioning machine—and the subsequent lawsuit it filed against Flow—and rule that Ruiz Fajardo never revoked its acceptance.  Each request should be denied.

# II.   BACKGROUND

## A.   Ruiz Fajardo Purchased a Water Jet Cutting System to Start a New Business.

Ruiz Fajardo is an approximately 250-employee engineering firm in Bogota, Colombia specializing in metalworking.  Ruiz Fajardo provides metalworking-related technical and

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 1 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

technological support for other engineering and design firms. It also builds parts for airplanes and oil refineries. Its clients include Ecopetrol, for example, the largest petroleum company in Colombia.

Ruiz Fajardo began exploring the idea of adding advanced cutting services to its business in 2012. Ruiz Fajardo's manager, Tuilo Ruiz, spoke with Flow's sales officer, Javier Gómez, regarding Flow's products at an international trade fair that year. Although Mr. Ruiz was looking to purchase a laser cutting machine, Mr. Gómez convinced Mr. Ruiz that a waterjet cutting machine would be better suited for Ruiz Fajardo's needs. Mr. Gómez demonstrated Flow's Mach 2 machine and emphasized that Flow was already producing a Mach 4 machine— which promised 3D and slanted cutting capabilities. Mr. Gómez also assured Mr. Ruiz that the Mach 4 machine would be capable of cutting steel up to 30 centimeters thick—far exceeding a laser cutting machine's capabilities. (Nelson Decl. Exh. 2 at 42-43.)

Based on Flow's assurances, Ruiz Fajardo ultimately purchased a waterjet cutting system M4-306C with a 94ID intensifier pump on May 1, 2013. (*Id*., Exh. 3.) Ruiz Fajardo paid $437,830 for the System, financing the purchase through the Banco de Bogota SA. (*Id.*) Because Ruiz Fajardo intended to use the System for a new business line, Ruiz Fajardo created a detailed business plan. (*Id*., Exh. 4.) It invested significant other funds into improvements at its facility to accommodate the system. (*Id.*, Exh. 5.) Ruiz Fajardo hired dedicated employees for this new business. Ruiz Fajardo also sought out and identified new business clients. (*Id.*)

**B.    The Flow System was Rife with Problems.**

The System was received and installed during the second half of 2013. There were substantial problems from the very beginning. The problems with the system included:

> **System startup issues requiring unnecessary and time-consuming procedures to be performed every time system was turned on.** There were two main startup issues: First, when the System is turned on, it should automatically start the servomotors and allow the operations to start. This did not work. Flow technicians were also unable to automatically start the servomotors and had to

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

show Ruiz Fajardo how to start the servomotors manually. This manual process did not always work on the first attempt *and sometimes took eight hours or more*. (Nelson Decl. Exh. 6 at 56-57, 62-63.) Second, each time the System was turned off, the "Homing" configurations and settings were lost and had to be reconfigured after the system was turned back on. This wasted considerable time doing unnecessarily repetitive tasks at least once a day and sometimes more often if the system froze or otherwise malfunctioned. (*Id.*, Exh. 6 at 64-65; Exh. 7 at 60-62, 95-96.)

**Software unable to produce accurate cutting times.** The software on the Flow System could not calculate accurate cutting times for programmed processes. This was one of Flow's most important features because Ruiz Fajardo charges customers by the amount of operational time, and it needs to be able to prepare accurate quotes. Because the software was not accurate, Ruiz Fajardo could only determine the cutting time for a job by running a complete simulation of the job with the system itself. The simulation meant that the Flow system was unavailable for actual production while the simulation was being conducted. (Thus, *an eight hour job took 16 hours*--eight hours of simulation to make a quote and eight hours to do the actual cutting.) Even that method was not always accurate, however; sometimes it estimated higher or lower times than the actual cutting times. Also, the system would freeze or shut down while running a simulation. This was a tremendous waste of time and resources. (*See* Nelson Decl. Exh. 2 at 21; Exh. 6 at 60; Exh. 7 at 52-53, 62-63, 96; Exh. 1 at 41-43.)

**Speed of cutting not consistent with representations by Flow.** The Flow system had been described as being capable of handling very complex cutting processes, but in reality the system crashed when asked to execute programs involving a large number of pieces. (*Id.*, Exh. 7 at 25-28, 62.) Also, Ruiz Fajardo was told that the Flow system was cost-effective in that several pieces of material could be stacked and cut at once. In reality, when materials were stacked, the cutting speed was not only slower than laser cutting, but also it was significantly slower than cutting each piece individually. (*Id*., Exh. 8; Exh. 9.)

**Poor durability of parts (consumable and non-consumable).** The parts and components for the Flow system have uniformly worn out long before they should have according to the system manual.

**Replacement parts were provided slowly, causing business delays.** Flow did not keep any replacement parts in Colombia or even South America, which caused significant delays any time a replacement part was needed.

The only issues that Flow resolved pre-lawsuit were the start-up issues. *It took Flow roughly 15 months to resolve the start-up issues.* For all other issues, Flow made unsuccessful

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 3 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

attempts to solve the problems with its System until February 2015, when it decided to terminate all technical service and to stop providing replacement parts under the warranty. (Nelson Decl. Exh. 8 at 12.) Ruiz Fajardo was able to continue operating the crippled System to a limited extent without service or replacement parts until February 2016, when the System failed altogether. The System remained wholly inoperable for another 17 months, well after this lawsuit was filed. *It took Flow four years to provide Ruiz Fajardo with the software necessary to resolve the critical cutting time simulation issue.*

**C.    Flow Made Many Failed Attempts to Repair the System.**

The machine was installed at Ruiz Fajardo's plant facilities by Mr. Ulises Muñoz, Flow's technician. (*Id.* at 1.) Immediately, the intensifier pump started leaking through one of the seals. Mr. Muñoz told Ruiz Fajardo that this was normal while the machine warmed up. The leaking never stopped, however, and in fact increased over time with the operation of the system. (*Id.*, Exh. 7 at 41.) In addition, Mr. Muñoz informed Ruiz Fajardo about the problem with the starting process and showed it how to start the servomotors manually. (*Id.*)

On October 4, 2013, Ruiz Fajardo met with Mr. Muñoz and Juan Carlos Jaimes, where they witnessed a malfunction of the 1-micron and 0.5-micron filters in the high-pressure pump. Ruiz Fajardo was assured that these filters would be replaced the next day, but they were not. (*Id.*, Exh. 9 at 8.) On October 7, 2013, Ruiz Fajardo discovered warm water leaks in the intensifier pistons at the high-pressure section and wrote to Mr. Tomas Sierra, Mr. Gómez, Mr. Muñoz, and Mr. Jaimes. (*Id.* at 6-8.) On February 17, 2014, Mr. Jaimes made a service visit in which Mr. Jaimes informed Ruiz Fajardo that he would replace the x-axis driver in the hopes of solving the servomotors start-up issue. It did not. (*Id.*, Exh. 8 at 2; Exh. 10 at 14.)

On May 21, 2014, Ruiz Fajardo sent an email to Flow identifying a series of inconsistencies in the Flow system. (Nelson Decl. Exh. 9 at 4-5.) Flow sent technician Gerardo Gasca on May 27th, who did a three-day assessment. (*Id.*, Exh. 8 at 2; Exh. 10 at 12.) Mr.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 4 -

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

Gasca stated in his report that he was unable to fix either the start-up issue or the time calculations issue *until the "software version change" had been completed.* (*Id.* (emphasis added).) In addition, Ruiz Fajardo was still waiting for replacement parts for repairing the intensifiers (even though, according to Gasca, they should have been provided with extra high-pressure seals with their first repair kit when the system was installed). Mr. Gasca did make some adjustments to the operation of the System, but some of the adjustments he wanted to make could not be done because the System only started manually, not automatically. After Gasca left, the status of the System remained unchanged. (*Id.*)

On June 4, 2014, Ruiz Fajardo sent an email to Horacio Marcos, asking for a reply on the pending matters with the system. Mr. Marcos responded and stated Flow was preparing a response. Flow's Javier Gómez wrote in a June 13, 2014 email that Flow would cover the cost of replacing the high-pressure seals even though they were not typically covered by the warranty. (*Id.*, Exh. 8 at 3-4.) Mr. Gómez also said that when Flow's technician was there he would also perform maintenance service to the check valves of the intensifier and hold a training session for Ruiz Fajardo personnel. Before the training, however, Ruiz Fajardo had to order additional parts totaling $588.06. (*Id.*)

With regard to the time calculation error, Mr. Gómez stated that "*As you know, FLOW's software department is working on a solution for this matter and we will install, free of charge, the new version of the software as soon as it has been developed.*" (*Id.* (emphasis added).) But Flow's only "solution" for the time calculation error was to install an outdated software version that did not support 3D cuts. (*See* Nelson Decl. Exh. 11.) Flow's work-around thus depended on hamstringing a signature feature of the Mach 4 machine.

With regard to the "homing" failure, Mr. Gómez acknowledged that "it was detected that the equipment loses the origin every time it is turned off." Mr. Gómez stated that "The equipment can work adequately, you just need to perform a different start-up procedure in order

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

to work normally with the equipment. Your staff has already been trained to do so. Nevertheless, the plan is to check this issue on Ulises's next visit to render the equipment in normal working conditions." (Nelson Decl. Exh. 8 at 4.) Ruiz Fajardo was not the only Flow customer to experience the homing failure—Flow's customer in Mexico experienced the same issue, *and Flow did not know how to resolve the problem.* (*See id*. Exh. 12.)

On June 20, 2014, Ruiz Fajardo responded to Mr. Gómez and insisted on firm dates on which the various issues could be resolved. (*Id.*, Exh. 8 at 5-6.) On July 11, 2014, Flow provided Ruiz Fajardo with new software, FLOWMASTER 6 (B Series) as an alternative option for the cutting time calculation issues. Its cutting times were also inaccurate and, as a consequence, unusable. (*Id.*, Exh. 8 at 6.) On July 22, 2014, Flow's technician, Juan Carlos Jaimes, came and replaced the dynamic seals of the two intensifiers and adjusted the cutting straightness of the XD head. (*Id.*; Nelson Decl. Exh. 10 at 10.)

From August 12 to 14, 2014, Flow's engineer, Guillermo Ortega, gave Ruiz Fajardo the promised 3D training sessions. (*Id.*, Exh. 10 at 9.) This training was completely wasted, however, because (1) Ruiz Fajardo did not yet have the 3D software from Flow, (2) the System did now allow FLOW SENSE errors to be checked from the controller, but rather from FLOW MC, and (3) Ruiz Fajardo had never received the P valve/control for the tank water level. During Mr. Ortega's visit, however, Ruiz Fajardo took the opportunity to give him testing samples of its mixing tubes, which were lasting only 50-60% of the service life listed in the Flow manual. Ruiz Fajardo never received any information about the testing of these samples despite several requests. (*Id.*, Exh. 8 at 7.)

On August 25, 2014, the System stopped working due to a jammed Z axis, and Ruiz Fajardo requested technical service again. (Nelson Decl. Exh. 8 at 6.) The jam occurred during operation of a customer order, which meant that the order had to be put on hold until the system had been fixed. Flow sent technician Jaimes the next day, who solved the problem with the Z

axis. (*Id.*, Exh. 8 at 6-7; Exh. 10 at 8.) He also discovered, however, that the linear bearing of the Y axis was also damaged, possibly because of a lack of lubrication. Lubrication on Flow's system is supposed to be automatically performed by the system itself.

The programming of the features that would have included lubrication had been done by Flow's technicians during the system's assembly and installation. Unfortunately, the damaged bearing had to be replaced, which involved ordering the part from Flow. Delivery took a week, only to discover that it was not the right part. Ultimately, the repair to the System was not completed until September 5, 2014. Ruiz Fajardo had no use of the System for 12 days and it lost the customer whose order was in process. (*See* Nelson Decl. Exh. 8 at 7; Exh. 10 at 8; Exh. 1 at 12-13.)

On September 15, 2014, Flow technician Juan Carlos Jaimes visited Ruiz Fajardo to replace the X axis encoder cable, again hoping to resolve the start-up issues of the System. There was no improvement. Mr. Jaimes noted that the FLOW XPERT software still had to be reinstalled. (Nelson Decl. Exh. 8 at 8; Exh. 10 at 7.) On September 19, 2014, the System had a bizarre malfunction in which the program started making unrequested cuts. (*Id.*, Exh. 8 at 8.) Technician Horacio Marcos inspected Ruiz Fajardo's programming and found no errors; in fact, when he restarted the program, it operated normally. This malfunction added to the sense that the System was troublingly unreliable. Further serious malfunctions occurred on September 23 and 29, 2014. As a result of the September 29 malfunction, an entire operation day was lost because Flow failed to provide service in a timely fashion. (*Id.* at 8-9.)

On September 30, 2014, Flow sent Héctor Pilot and Rodolfo Dietl to Ruiz Fajardo to finally deliver a copy of the FLOW XPERT DESIGN software (the 3D programming and cutting routes application). (Nelson Decl. Exh. 8 at 9.) They scheduled a training session with Guillermo Ortega for October 10 and 11, 2014. In the meantime, the System experienced errors when shifting from the positive Y axis during cuts. The only remedy was to shut the machine

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 7 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

off. When the machine was turned back on it was unable to resume the cut and had to be manually adjusted, which could not be done with the necessary precision.

When the training day came, Flow's technicians had to spend the entire time fixing the System, which again was jammed and not starting up even manually. (*Id.*, Exh. 8 at 9; Exh. 10 at 6.) Flow sent Juan Carlos Jaimes to solve the problem, and while he was there he also noticed that the machine's cutting head was at the wrong angle and was therefore unsuited to 3D cutting. The issues were not resolved during this visit. (*Id.*, Exh. 2 at 22.)

On October 16, 2014, Flow's Ulises Muñoz visited Ruiz Fajardo and did a general checkup of the system. He found that (1) there was a problem when trying to load the AR010 data; (2) the software presented errors when calculating the time estimates; (3) the X axis motor presented an encoder failure in the data backup; (4) there was evidence of a manufacturing defect; (5) the pump operating temperature control was deficient, and; (6) it was recommended to replace the controller with the latest update of the software. (*Id.*, Exh. 8 at 9-10; Exh. 10 at 4.) Flow then refused to send Ruiz Fajardo the necessary parts until Ruiz Fajardo brought its account up to date. After Ruiz Fajardo reminded Flow that the System had never worked as intended, Flow's Bruno Frascarolli admitted that it "was a mistake on my part not to have been well informed regarding the operational situation of your machine." Flow then sent the materials. (*Id.*, Exh. 13.)

Ruiz Fajardo received a replacement controller and X-axis motor in November 2014. (Nelson Decl. Exh. 8 at 10.) They scheduled a technical service visit with Ulises Muñoz for December 15-18, 2014. (*Id*. at 10-11.) This visit finally resolved the start-up malfunctions, but it failed to address the insufficiency of the system's cutting time calculations, even with the new software version. In addition, Mr. Muñoz discovered that two additional parts would need to be replaced due to premature wear: the deceleration resistor A-25094-1 and the solid state relay A-25184-1. (Nelson Decl. Exh. 8 at 11-12; Exh. 10 at 2.)

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 8 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

On January 29, 2015, Flow's technician, William Aguirre, installed the replacement parts. He identified another part that would need to be replaced as well: the communication switch, which was creating a signal conflict. (*Id.*, Exh. 8 at 12; Exh. 10 at 1.) Only five days later, on February 3, 2015, Ruiz Fajardo discovered a leak in the cutting head of the system. It contacted Mr. Aguirre, who helped over the phone by suggesting an adjustment of the System. This fix only lasted a few days, however. (*Id.*, Exh. 8 at 12.) Mr. Aguirre visited on February 9, 2015, and discovered a crack at the top of the cutting head, which had further caused the perforation of the protection lid. The System had to be stopped until replacement parts were installed. (*Id.*)

When Ruiz Fajardo asked for the replacement parts under the warranty, Flow's representatives Rodolfo Dielt and Bruno Frascarolli informed it that Flow would not be providing any further technical service or warranty parts until Ruiz Fajardo caught up with payment balance in arrears. (Nelson Decl. Exh. 8 at 12.) This balance represented the costs of prior replacement parts for which Flow denied warranty coverage. From February 2015 to July 2017, Ruiz Fajardo did not receive any technical service or replacement parts from Flow. (*Id.*)

In February 2016, the System failed completely when the XD head Harmony Actuator was damaged after only 496.7 hours of operations. Ruiz Fajardo contacted Flow for extraordinary technical service to check the malfunction, and Flow did send a representative. The technician discovered a water leak inside the actuator and recommended that the actuator be replaced (despite having an "indeterminate" service life according to the Flow manual). Ruiz Fajardo was not able to obtain the replacement part from Flow. (*Id.*)

**D.      Flow Repaired the System in July 2017 But Problems Persist.**

Ruiz Fajardo filed suit against Flow on December 13, 2016. (Dkt. 1.) A few months later, Flow reluctantly offered to try to repair the System one last time. (Nelson Decl. Exh. 14.) During repairs, Flow installed new "Rev J" software (that was apparently not available until a

<table>
<tr><td>RUIZ FAJARDO'S OPPOSITION TO<br>FLOW'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT<br>(2:16-CV-01902-RAJ)</td><td>- 9 -</td><td>Betts<br>Patterson<br>Mines<br>One Convention Place<br>Suite 1400<br>701 Pike Street<br>Seattle, Washington 98101-3927<br>(206) 292-9988</td></tr>
</table>

1324474.docx/110918 1539/8404-0001

few months prior to the repairs), proving Ruiz Fajardo's suspicion that Flow sold it a machine without adequate software to run it.[1]

The Flow System still does not work as Flow guaranteed. While most issues were finally resolved in July 2017, Ruiz Fajardo continues to experience problems. Flow represented that the Z axis was automatic when Ruiz Fajardo purchased the machine and the Z axis capability was the reason Ruiz Fajardo purchased it. The "quotation summary" that accompanied the machine stated that the machine included a "fully programmable servo-driven Z-Axis." (Nelson Decl. Exh. 3 at 1, 4.) Flow now informs Ruiz Fajardo that Z axis cuts cannot be done automatically on this machine. Thus, Flow's wildly tardy repairs have still failed to remedy a critical deficiency in the System.

The durability of certain parts has also been significantly lower than that originally represented by Flow: (1) mixing tubes: the manual lists service life at 120 hours, but they only lasted 60 (*Id.*, Exh. 3 at 8; Exh. 14, items 4 and 5); (2) high pressure (HP) seals for the intensifier pump: the manual lists service life at 500 hours, but they only lasted 250 (Nelson Decl. Exh. 14, item 6); (3) bleed down valve: the bleed down valve had previously failed and Flow has never addressed the pump issues that were identified (*Id.*, Exh. 14, item 7); (4) the 90 degree elbow of the cutting head: the manual lists service life at 800 hours, but they only lasted 295 (*Id.*, Exh. 3 at 7; Exh. 14, item 9); (5) the on/off valve: the On/Off valve had previously leaked and Flow has never addressed the pump issues that were identified. (*Id.*, Exh. 14, item 10).

---

[1] The first software to be installed in the machine was FLOW MASTER 7. The 3D design application software (FLOW EXPERT DESIGN) was not installed at that time, notwithstanding the fact that the "quotation summary" and "technical specifications" for the machine stated that the 3D software was included. (Nelson Decl. Exh. 4 at 2, 10.) The FLOW MASTER 7 software did not allow the machine to measure accurate cutting times. To fix this problem, Flow provided Ruiz Fajardo with the FLOW EXPERT DESIGN software; however, after it was installed, the machine still did not measure accurate cutting times. Flow then installed the FLOW MASTER 6 (B SERIES) software in the machine, which also did not work because that software was designed for 60,000 PSI machines in the "B SERIES," whereas Ruiz Fajardo's machine was 87,000 PSI and in the "C SERIES."

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 10 -

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

# III. ARGUMENT AND AUTHORITY

## A. Summary Judgment Standard.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1210 (W.D. Wash. 2018). "In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but 'only determine[s] whether there is a genuine issue for trial.'" *Id.* at 1209-10 (alteration in original) (quoting *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994)).

## B. Flow's Limited Warranty Failed of its Essential Purpose, Allowing Ruiz Fajardo to Recover Consequential Damages under Washington Law.

In Washington, the sale of goods is governed by Washington's Uniform Commercial Code ("UCC"). Under the UCC, a disappointed buyer may bring a claim for breach of contract when the goods were not delivered, delivered late, have been rejected, or acceptance has been revoked. A claim for breach of contract is akin to a claim for rescission at common law. A buyer may revoke his or her acceptance, within a reasonable time, "of a lot or commercial unit whose nonconformity substantially impairs its value to him or her if he or she has accepted it." RCW 62A.2-608. A rightfully rejecting or revoking buyer may cancel the contract and recover direct damages, incidental damages, and consequential damages, or seek specific performance. RCW 62A.2-711, 712, 713, 716.

In contrast, a disappointed buyer's breach of *warranty* claim arises only after he or she has finally accepted the goods. RCW 62A.2-606. A buyer who finally accepts nonconforming goods and reasonably notifies the seller of the breach has a breach of warranty claim. RCW 62A.2-607(3). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

\- 11 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

have had if they had been as warranted. . . ." RCW 62A.2-714(2).  "In a proper case, incidental and consequential damages . . . may also be recovered."  RCW 62A.2-714(3).

Here, the sales contract provides that Flow's liability is limited to repair or replacement. (Nelson Decl., Exh. 3 at 23-24.)  With regard to both breach of contract and breach of warranty claims, however, a disappointed buyer may resort to *all* remedies available under the UCC where a limited remedy fails of its essential purpose.[2]  *See* RCW 92A.2-719 ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title.").

> A contractual provision limiting the remedy to repair or replacement of defective parts fails of its essential purpose within the meaning of § 62A.2-719(2) if the breaching manufacturer or seller is unable to make the repairs within a reasonable time period.  It is not necessary to show negligence or bad faith on the part of the seller, for the detriment to the buyer is the same whether the seller's unsuccessful efforts were diligent, dilatory, or negligent.

*Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 707-08 (9th Cir. 1990) (internal citations omitted).

The sales contract also contains an exclusionary clause, stating that Flow "shall not be liable for incidental or consequential damages."  (Nelson Decl. Exh. 3 at 23-24.)  "Exclusionary clauses in commercial transactions are prima facie conscionable."  *Cox v. Lewiston Grain Growers, Inc.*, 86 Wn. App. 357, 368, 936 P.2d 1191 (1997), *review denied*, 133 Wn.2d 1020. However, "[e]ven if the exclusionary clause [is] deemed conscionable, it is unenforceable if it fails its essential purpose.  When a limitation of remedy clause deprives a party of the substantive value of its bargain, it is ineffectual."  *Id.* at 370 (citing *Am. Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 226, 797 P.2d 477 (1990); *Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977)).

---

[2] Flow's motion for partial summary judgment does not ask the Court to decide whether the limited remedy here failed of its essential purpose.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 12 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

This result is consistent with the purposes of the U.C.C.:

> Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

> However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

U.C.C. § 2-719, official cmt. 1 (emphasis added).

In its motion for partial summary judgment, Flow ignores pertinent case authority and argues that exclusionary clauses are categorically enforceable even when a limited remedy fails of its essential purpose. Flow asserts that "the majority or [sic] courts treat consequential damages limitations and limited remedies independently." (Dkt. 32 at 8.) In so arguing, Flow relies almost exclusively on a case from the Sixth Circuit, *Lewis Refrigeration v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427 (6th Cir. 1983), and an unreported case from the district court of Colorado. Neither is persuasive. To the contrary, the purported application of Washington law to hold that exclusionary clauses are necessarily valid unless unconscionable was *explicitly rejected* by the Ninth Circuit in *Fiorito Bros., Inc. v Fruehauf Corp.*, 747 F.2d 1309 (1984).

*Fiorito* concerned a construction company of the same name that purchased 13 dump-truck bodies in order to carry wet concrete to highway construction sites. *Id.* at 1310. The sales contract contained a warranty limiting the buyer's sole remedy to repair or replacement, as well as an entirely separate provision disclaiming liability for consequential damages. *Id.* at 1311.

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

Following purchase, the truck bodies began to develop a number of problems. Despite Fiorito notifying the seller of these issues, the seller was unable or unwilling to repair the truck bodies to an acceptable condition. *Id.* at 1311.

After concluding that the seller's limited "repair or replace" remedy had failed of its essential purpose, the court in *Fiorito* turned to the exclusionary damages clause. *Id.* at 1313. The court noted that "no Washington court has been faced with a situation in which the seller has both a limited-remedy clause and a separate clause disclaiming consequential damages, then asserts that failure of the limited remedy does not affect the validity of the damages clause under § 62A.2-719(3)." *Id.* at 1314. But despite the Washington Supreme Court having never ruled on the issue, the *Fiorito* court had no trouble concluding that the exclusionary damages clause was unenforceable in such a situation.

In rejecting the categorical approach advocated by the seller, the *Fiorito* court noted that "the majority of the cases support Fiorito's position that each case and each contract must be judged on its own merits." *Id.* at 1314 (collecting cases). In examining these contract provisions, the intent of the parties is paramount. In most cases, it does not make sense to view the exclusive-remedy provision and the consequential-damages provision independently. This is particularly true where the parties have contracted for a limited repair or replace remedy. *See id.* at 1315 ("'the fundamental intent of section 2-719(2) reflects that a remedial limitation's failure of essential purpose makes available all contractual remedies, including consequential damages authorized pursuant to sections 2-714 and 2-715.' [A] seller could not be allowed 'to shelter itself behind one segment of the warranty when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty.'") (quoting *Soo Line Railroad Co. v. Fruenhauf Corp.*, 547 F.2d 1365, 1373 (8th Cir. 1977)); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F. Supp. 39, 43-44 (N.D. Ill. 1970)). Accordingly, the *Fiorito* court agreed with the trial court's conclusion that "[i]t cannot be maintained that it was the parties' intention

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 14 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

that Defendant be enabled to avoid all consequential liability for breach by first agreeing to an alternative remedy provision designed to avoid consequential harms, and then scuttling that alternative remedy through its recalcitrance in honoring the agreement." *Id.* at 1315.

In reaching its conclusion, the court in *Fiorito* examined the Sixth Circuit's holding in *Lewis Refrigeration* and *explicitly rejected* it: "[w]e are not bound by *Lewis Refrigeration*, of course, and decline to follow it. The Washington courts, we believe, will opt for the case-by-case determination method of resolving this issue." *Fiorito*, 747 F.2d at 1314. The Ninth Circuit predicted correctly, and courts have since applied the case-by-case analysis—rendering ineffectual exclusionary damage provisions—time and time again. *See, e.g., Milgard*, 902 F.2d at 709 ("We agree with the district court's decision to lift the cap on consequential damages. . . [The seller's] inability to effect repair despite 2.5 years of intense, albeit injudicious, effort caused [the buyer] losses not part of the bargained-for allocation of risk. Therefore, the cap on consequential damages is unenforceable."); *see also Am. Nursery Products*, 115 Wn.2d at 226 ("Since we find the exclusionary clause is conscionable, the question then becomes whether the clause is enforceable."). Indeed, the Washington Court of Appeals has stated clearly that "[e]ven if the exclusionary clause [is] deemed conscionable, it is unenforceable if it fails its essential purpose." *Cox*, 86 Wn. App. at 370.

Here, Flow concedes that there is a genuine dispute of material fact concerning whether its limited warranty failed of its essential purpose. Ruiz Fajardo purchased an expensive waterjet cutting machine for its new business and was assured by Flow that the System was appropriate for its needs. But Flow was never able to render the System in working order and Ruiz Fajardo was ultimately exposed to the *exact consequential damages that the limited warranty was intended to prevent.*[3] Nevertheless, Flow argues that, pursuant to a Sixth Circuit case *explicitly*

---

[3] Flow characterizes its exclusionary damages provision as "separate and distinct from the sales contract's provision limiting the remedies Ruiz Fajardo may pursue to repair and replacement." Dkt. 32 at 6. Flow's characterization is based on the fact that the two provisions are in separate paragraphs. But

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 15 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

*rejected* by the Ninth Circuit and not followed by any Washington appellate court, Washington law permits a seller to avoid its duties under a limited warranty and then escape liability for the resulting consequential damages. In so arguing, Flow misrepresents the state of the law in Washington, derogating the appropriate analysis to a mere footnote.

A genuine dispute of material fact exists as to whether Flow's limited warranty failed of its essential purpose, rendering ineffectual Flow's exclusionary damages clause pursuant to extensive Washington case authority. Accordingly, the Court should deny Flow's motion.

## C. Flow Mischaracterizes the Warranties Made to Ruiz Fajardo.

Flow asks this Court to restrict Ruiz Fajardo's breach of warranty claim to only the limited warranty represented in the sales contract. Flow further asks this Court to rule that its limited warranty ended on May 3, 2014. Dkt. 32 at 10-12. Both rulings would be premature and, accordingly, should be denied.

Ruiz Fajardo first became aware of Flow's waterjet cutting machines at an international trade fair in 2012. (Nelson Decl. Exh. 2 at 40-43.) Flow's Javier Gómez met with Mr. Ruiz and showed Mr. Ruiz a Flow Mach 2 machine. *Id.* Mr. Ruiz was looking to purchase a laser cutting machine, but Mr. Gómez represented that Flow's waterjet cutting machine would offer better performance than laser. *Id.* Mr. Gómez emphasized that the machine at the fair was a Mach 2 and that Flow was already producing a Mach 4 machine. Mr. Gómez explained that the Mach 4 could do *cuts in 3D* and *perform slanted cuts*. Mr. Gómez later toured Ruiz Fajardo's factory, saw what kinds of work and materials were being used, and assured Mr. Ruiz that the Flow Mach 4 machine would be appropriate for *cutting materials as thick as 30 centimeters*. *Id.* at 43.

---

*Fiorito* also concerned a limited warranty and an exclusionary damages provision that were separate paragraphs in distinct sections of the contract. 747 F.2d at 1311, n.1. That the two provisions in *Fiorito* were listed under separate sections did not change the fact that they were "inseparable parts of a unitary package of risk-allocation." *Milgard*, 902 F.2d at 708 (citing *Fiorito*, 747 F.2d at 1314-15). The same is true here.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 16 -

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

The market in Colombia needed machines that would cut up to an inch of stainless steel. Flow assured Ruiz Fajardo that its Mach 4 machine would be appropriate for that type of work. *Id.*

Ruiz Fajardo relied on Flow's assurances that the System would be appropriate for Ruiz Fajardo's intended uses. Flow's representations were aligned with the sales contract that was shown to Mr. Ruiz during and following the trade fair. Not contained in the document shown to Mr. Ruiz, however, were the terms and conditions—including the provision disclaiming implied warranties. *Id.* at 64-66. These terms and conditions were not provided to Mr. Ruiz until it was time to sign the sales contract. *Id.*

An implied warranty of fitness for a particular purpose arises where "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." RCW 62A.2-315. RCW 62A.2-316 permits a seller to limit or exclude warranties. "However, disclaimers are not favored in the law; as a result, courts have added two conditions for effectiveness: a disclaimer must be explicitly negotiated or bargained for and it must set forth with particularity the qualities and characteristics being disclaimed." *Rottinghaus v. Howell*, 35 Wn. App. 99, 103, 666 P.2d 899 (1983) (citing *Berg v. Stromme*, 79 Wn.2d 184, 484 P.2d 380 (1971)). This principal is often referred to as the *Berg* rule.

Although the *Berg* rule is mostly associated with consumer transactions rather than commercial transactions, courts have nevertheless applied the rule to commercial transactions when the circumstances warrant it. *Cox*, 86 Wn. App. at 367-68, is instructive. The plaintiffs in *Cox* owned a ranching and farming business that required winter wheat seed. The defendant, LGG, provided a report to the plaintiffs showing that its winter wheat seed was Stephens variety certified—a certification requiring a germination rate of at least 85 percent. LGG sold the seed to the plaintiffs and disclaimed any express or implied warranties. The realized germination rate was between 22 and 42 percent. *Id.* at 362-63.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 17 -

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

The plaintiffs in *Cox* sued LGG for breach of warranty and the trial court concluded that the warranty disclaimer was unenforceable. The court of appeals affirmed. *Id.* at 368. Although the parties were both merchants, the court nevertheless applied the *Berg* rule, consistent with supreme court precedent. "The *Berg* rule has been applied to commercial transactions when both parties were businessmen. The rule operates to prevent one party in a commercial transaction from being harmed by unfair surprise." *Id.* at 367-68 (citing *Am. Nursery Products, Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 223, 797 P.2d 477 (1990)). In so ruling, the court reasoned that application of the *Berg* rule to commercial transactions was appropriate when the circumstances were sufficiently similar to those in *Berg*.

> In *Berg*, the buyer purchased an automobile and negotiated for many variable items, such as color, size, power, and additional equipment. *Berg* held that when a buyer communicates his particular needs to a seller, boilerplate disclaimers should not be effective.

> This case is similar to *Berg*. Mr. Cox wanted to purchase a specific type of seed, Stephens variety certified. The variety and certification were important to Mr. Cox. LGG sold him the seed as certified. Regardless of whether this is a consumer or commercial transaction, the *Berg* rule should apply due to the specific requirements of the sale.

*Cox*, 86 Wn. App. at 368 (citations omitted).

The circumstances here are sufficiently similar to those in *Berg* and *Cox*, making application of the *Berg* rule appropriate. Flow was intimately aware of Ruiz Fajardo's needs for a cutting machine—specifically 3D cutting, slanted cutting, and the cutting of stacked materials up to 30 centimeters high—and Flow assured Ruiz Fajardo that the System was capable of handling these requirements. Flow and Ruiz Fajardo negotiated for additional parts and specific machine capabilities. (*See* Nelson Decl. Exh. 3 at 3.) Flow initially provided Ruiz Fajardo with

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 18 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

a sales contract that contained no disclaimer of warranties. Rather, Flow waited until signing to provide those terms and conditions to Ruiz Fajardo.[4]  (*See* Nelson Decl. Exh. 2 at 65.)

Furthermore, although Flow now insists on a ruling that the limited warranty ended on May 3, 2014, Flow repeatedly assured Ruiz Fajardo that the warranty would not begin until the system was working as intended.  (*See* Nelson Decl. Exh. 2 at 67 ("I kept asking Javier about . . . when was the warranty going to start, and he always told me, 'Once the machine is delivered and it's working.'")).  Indeed, both parties continuously operated with the understanding that the warranty would not start until the machine was delivered in working order.  Accordingly, Flow continued to provide parts and services to Ruiz Fajardo to bring the System into working order for nearly an entire year *after* May 3, 2014.  (*See* Nelson Decl. Exh. 8 at 3-4; Exh. 13.)

A ruling that the limited warranty ended on May 3, 2014 would ignore the intent of the parties in entering into the agreement as well as the parties' conduct following Ruiz Fajardo's discovery that the System did not work as guaranteed.  Finally, such a ruling would deprive Ruiz Fajardo of the benefit of its bargain.  The System *never* worked and Flow was not able to repair the System for over two years before finally giving up—if the limited warranty ended before the System was ever delivered in working order then it was entirely useless to bargain for the warranty in the first place.

Flow provided Ruiz Fajardo with a written warranty limited to repair or replacement.  But Flow also warranted that the System was fit for Ruiz Fajardo's particular intended uses.  Flow then told Ruiz Fajardo that the warranties would not begin until the System was working as intended—an assumption that the parties operated under for years.  Genuine issues of material

---

[4] Contract clauses that negate warranties such as that of fitness for a particular purpose are clauses that "materially alter" a contract.  RCW 62A.2-207(1), official cmt. 4.  Accordingly, such provisions need to be "discussed, negotiated, or bargained for."  *Rottinghaus*, 35 Wn. App. at 106.  Notably, "actual knowledge of the disclaimer is insufficient to give it effect.  Without negotiation and agreement, no disclaimer . . . can be effective."  *Id.* at 106-07.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 19 -

1324474.docx/110918 1539/8404-0001

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

fact exist as to what warranties Flow provided to Ruiz Fajardo and when those warranties ended. Accordingly, the Court should deny Flow's motion.

**D. The Filing of this Lawsuit Constitutes Revocation of Acceptance.**

Ruiz Fajardo experienced significant problems with the System from the very beginning. Ruiz Fajardo immediately contacted Flow to report the issues with the System, and Flow assured Ruiz Fajardo time and time again that it would promptly render the System in working order. Unable or unwilling to fix the System, Flow eventually abandoned any attempt at repair or replacement, and Ruiz Fajardo was forced to file this suit. The suit unquestionably constitutes revocation of acceptance of the System.

Revocation of acceptance is effectuated pursuant to RCW 62A.2-608[5]:

> (1) The buyer may revoke his or her acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him or her if he or she has accepted it:
>
> > (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> >
> > (b) Without discovery of such nonconformity if his or her acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he or she had rejected them.

---

[5] Flow asserts that revocation "does not occur under Washington law unless the buyer takes a series of steps." Dkt. 32 at 13. But none of the cases cited by Flow identify a necessary "series of steps." To the contrary, whether a revocation was effective is a determination made by analyzing what actions the buyer *and seller* took in light of all of the circumstances. *See Aubrey's R.V. Center, Inc. v. Tandy Corp.*, 46 Wn. App. 595, 603-05, 731 P.2d 1124 (1987) (analyzing the steps taken by both the buyer and the seller to determine whether revocation was timely and effective).

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 20 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

*Id.*  This provision "does not require the notice to be in any particular form.  Such notice may be implied, in fact, from conduct.  What constitutes a reasonable time in which to give notice is a question of fact to be determined form the particular circumstances of the case."  *Aubrey's R.V. Center, Inc. v. Tandy Corp.*, 46 Wn. App. 595, 602-03, 731 P.2d 1124 (1987) (internal citations omitted).[6]

A buyer's repeated attempts to get the seller to repair or replace the nonconforming goods extends the time period before notification of revocation may be given.  *See Fenton v. Contemporary Dev. Co., Inc.*, 12 Wn. App. 345, 349, 529 P.2d 883 (1974) ("the defendant had opportunity to, and did on numerous occasions attempt to, cure certain of said faults and defects, but failed so to do.");  *see also Aubrey's*, 46 Wn. App. at 603-604 ("the record indicates a continuing series of complaints, negotiations, promises, and repeated attempts by [the seller] to adapt the software to the hardware.  After [the seller] had ceased further attempts to rectify the software problems . . . Aubrey's initiated this action.").  The initiation of a lawsuit following a seller's failed attempts at repair can, without more, constitute revocation.  *See Fenton*, 12 Wn. App. at 349 ("the commencement of suit to reclaim the purchase price is also sufficient notice of rescission.");  *Aubrey's*, 46 Wn. App. at 599, 603 (initiation of lawsuit without more constituted revocation).

A seller's actions are also an important factor for consideration.  This is especially true where, as here, the seller asserts that the buyer's continued dominion over the nonconforming goods constitutes a waiver of revocation.  "Whether continued use of goods after notification vitiates the revocation depends on the reasonableness of that use.  Whether such use is reasonable is a question of fact."  *Id.* at 604 (internal citations omitted).  When determining

---

[6] Official Comment 4 to RCW 62A.2-608 states that, because "this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender."

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

whether a continued use of goods after revocation is reasonable, the following factors are appropriate for consideration:

> (1) Upon being apprised of the buyer's revocation of his acceptance, what instructions, if any, did the seller tender the buyer concerning return of the now rejected goods? (2) Did the buyer's business needs or personal circumstances compel the continued use? (3) During the period of such use, did the seller persist in assuring the buyer that all nonconformities would be cured or that provisions would otherwise be made to recompense the latter for the dissatisfaction and inconvenience which the defects caused him? (4) Did the seller act in good faith? (5) Was the seller unduly prejudiced by the buyer's continued use?

*Id.* at 604-603 (quoting *McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 5 Ohio St. 3d 181, 449 N.E.2d 1289 (1983)).

Here, Ruiz Fajardo notified Flow of the System's problems promptly following delivery and continued to seek assistance from Flow for years following delivery. Flow repeatedly assured Ruiz Fajardo that it would render the System in working order, consistent with the representations made by Flow before purchase. Ruiz Fajardo allowed Flow, in good faith, an extended period of time to repair the System. Consistent with revocation, Ruiz Fajardo refused to pay for replacement materials that were necessary to repair the machine. (Nelson Decl. Exh. 13.) But Flow could not fix the problems with the System and ultimately abandoned its repair efforts. After Ruiz Fajardo accepted that Flow was unwilling or unable to repair the machine as promised, Ruiz Fajardo filed this lawsuit. These actions constitute revocation.[7] *See Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 49, 554 P.2d 349 (1976) ("When plaintiff first was put on notice of the vehicle's defects, he refused to permit defendant to make repairs at a 50 percent cost to him. Any conduct clearly manifesting the buyer's desire to get his money back is a sufficient notice to revoke.").

---

[7] Nevertheless, Flow asserts that the filing of this suit cannot constitute revocation because the complaint does not "state that Ruiz Fajardo wishes to revoke acceptance." Dkt. 32 at 14. But Flow cites to no authority that requires any such statement. Indeed, such a requirement would ignore the well-established principal that revocation may be implied by conduct. *Aubrey's*, 46 Wn. App. at 602-603; *Fenton*, 12 Wn. App. at 348.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 22 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

Flow also argues that Ruiz Fajardo essentially waived revocation because it continued to use the System. But Ruiz Fajardo's continued dominion over the rejected goods does not constitute a waiver of rescission. First, Flow tendered no instructions to Ruiz Fajardo concerning the return of the System despite the fact that the System sat unused for nearly a year. Second, before the System became completely inoperable, Ruiz Fajardo's new business required it to make every effort to use the System to complete jobs and retain customers. Ruiz Fajardo was still leasing the System, whereas Flow had already been paid in full. Third, Ruiz Fajardo was consistently assured by Flow that the System would be rendered in working condition before each new attempt at repair. Fourth, the most significant problems with the System stemmed from the fact that Flow had sold Ruiz Fajardo a machine for which the necessary software had not been developed and which was not suitable for the work that Ruiz Fajardo wanted to complete. Finally, Flow was not prejudiced in any manner by Ruiz Fajardo's continued control over the rejected goods—it had already received the entire purchase price and only stood to lose money by facilitating the repair or revocation of acceptance. *See Aubrey's*, 46 Wn. App. at 604-605.

Genuine disputes of material fact exist as to whether Ruiz Fajardo revoked acceptance of the System. Accordingly, the Court should deny Flow's motion.

## IV.    CONCLUSION

Ruiz Fajardo invested over $650,000 in a state-of-the-art waterjet cutting machine, guaranteed by Flow to be better than laser and suitable for Ruiz Fajardo's particular needs. Unbeknownst to Ruiz Fajardo, Flow's Mach 4 system was riddled with defects and was lacking the very software that was necessary to properly operate the machine. After attempting and failing to repair the System for years, Flow eventually *abandoned* its efforts and only sent qualified technicians after Ruiz Fajardo filed this lawsuit. Flow's deception cost Ruiz Fajardo its customers, revenue, reputation, key employees, and early access to the Colombian market.

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 23 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

Nevertheless, Flow now seeks to avoid liability for its actions. First, Flow asks this Court to ignore pertinent Ninth Circuit and Washington precedent and rule that it cannot be held liable for consequential damages, even though its limited warranty failed of its essential purpose. Second, Flow demands a premature ruling that the representations it made to Ruiz Fajardo before purchase—representations upon which Ruiz Fajardo relied—cannot constitute warranties in light of a disclaimer that was never negotiated or bargained for by the parties. Third, Flow insists on a ruling that its limited warranty expired *before the System ever worked*. Finally, Flow urges the Court to penalize Ruiz Fajardo for its good-faith extension of time for repair and rule that Ruiz Fajardo has never revoked acceptance—despite Ruiz Fajardo's refusal to pay for Flow's failed repair efforts and the eventual filing of this lawsuit.

Genuine disputes of material fact exist as to all of Flow's requested rulings and, accordingly, Flow's motion should be denied.

DATED this 9th day of November, 2018.

BETTS, PATTERSON & MINES, P.S.

By  /s James D. Nelson
By  /s Jesse L. Taylor
    James D. Nelson, WSBA #11134
    jnelson@bpmlaw.com
    Shaina R. Johnson, WSBA #46079
    sjohnson@bpmlaw.com
    Jesse L. Taylor, WSBA #51603
    jtaylor@bpmlaw.com
Betts, Patterson & Mines, P.S.
701 Pike Street, Suite 1400
Seattle WA  98101-3927
Phone: (206) 292-9988

Attorneys for Plaintiff

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

- 24 -

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001

## CERTIFICATE OF SERVICE

I, Lauren M. Brown hereby certify that on November 9, 2018, I electronically filed the following:

- **RUIZ FAJARDO'S OPPOSITION TO FLOW'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and**

- **Certificate of Service.**

with the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for Defendant Flow International Corporation*
Andrew Escobar
Jeffrey DeGroot
DLA Piper LLP
701 5th Ave Ste 7000
Seattle, WA 98104-7044

DATED this 9th day of November 2018.

BETTS, PATTERSON & MINES P.S.

By  /s Lauren M. Brown

RUIZ FAJARDO'S OPPOSITION TO
FLOW'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
(2:16-CV-01902-RAJ)

Betts
Patterson
Mines
One Convention Place
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1324474.docx/110918 1539/8404-0001