HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RUIZ FAJARDO INGENIEROS ASOCIADOS S.A.S., a foreign corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FLOW INTERNATIONAL CORPORATION, a Delaware corporation,<br><br>Defendant. | NO. 2:16-CV-01902-RAJ<br><br>PLAINTIFF RUIZ FAJARDO'S OPPOSITION TO FLOW'S (1) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW; (2) MOTION FOR A NEW TRIAL; AND (3) MOTION FOR EXTENSION OF THE RULE 62 STAY OF ENFORCEMENT<br><br>NOTE ON MOTION CALENDAR:<br>March 22, 2019 |

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 0 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

## I. INTRODUCTION AND BACKGROUND

Ruiz Fajardo Ingenieros Asociados S.A.S. ("Ruiz Fajardo") filed suit against Flow International Corporation ("Flow") for breach of warranty. Ruiz Fajardo's entire case was premised on the simple theory that the waterjet cutting machine that it purchased from Flow did not conform to product specifications and was therefore defective. The precise defects were numerous and ran the gamut from x-axis related startup issues to an inability to accurately calculate cutting times or remember the home position. Importantly, Ruiz Fajardo was unable to use the machine to perform bevel cuts on large sheets of metal—the foundational requirement for Ruiz Fajardo's new business line. Lacking this key functionality, the waterjet cutting machine was rendered virtually worthless to Ruiz Fajardo.

Flow argued to the jury that Ruiz Fajardo's waterjet cutting machine was defect-free. Flow's theory of the case was that the problems faced by Ruiz Fajardo were the result of poor training and improper maintenance. But a plethora of internal Flow documents contradicted Flow's narrative, providing the jury with overwhelming evidence of both mechanical and software related defects. The jury ultimately awarded Ruiz Fajardo $437,830.00 in unspecified damages. (James Nelson Declaration ("Nelson Decl.") Ex. 1.)

All of Flow's post-trial motions must be denied. First, Flow's renewed motion for judgment as a matter of law must be denied because its contrived design defect argument is a mischaracterization of the law and, accordingly, finds no support in Washington law or the facts of this case. Second, Flow's motion for a new trial must be denied because Ruiz Fajardo's breach of warranty claim was supported by *overwhelming* evidence. Indeed, a waterjet cutting machine that could not even consistently turn on for over a year—let alone perform the type of cut necessary for Ruiz Fajardo's new business line—was worthless to Ruiz Fajardo. Finally, Flow's motion for an extension of the automatic stay without security must be denied because Flow has not provided a single reason why it cannot secure the stay with a bond.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL    - 1 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

## II. ARGUMENT AND AUTHORITY

**A. The Court Must Deny Flow's Motion for Judgment as a Matter of Law.**

Pursuant to Federal Rule of Civil Procedure 50(b), a court may grant a renewed motion for judgment as a matter of law only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014). The court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "The court may only give credence to evidence favoring the moving party if that evidence is 'uncontradicted,' 'unimpeached,' and 'comes from disinterested witnesses.'" *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1193 (W.D. Wash. 2018) (quoting *Reeves*, 530 U.S. at 150).

### 1. Ruiz Fajardo Has Never Asserted a Design Defect Claim.

For a fourth time, Flow attempts to drag the Court into the realm of products liability law by manufacturing a design defect claim.[1] But Ruiz Fajardo has *never* asserted that the waterjet cutting machine's design was defective. (*See* Dkt. 1.) To the contrary, Ruiz Fajardo's entire claim was based on the premise that the Flow system did not meet product specifications—i.e. it did not conform to the intended design—making a design defect claim entirely inapposite. Flow's design defect argument fails for four reasons: (1) no Washington authority holds that a warranty for defects in materials and workmanship necessarily excludes defects in design OR that a software bug is necessarily a design defect; (2) even under Flow's California cases, Ruiz Fajardo did *not* assert a design defect claim; (3) the jury was provided with substantial evidence of both software and non-software related defects; and (4) Flow's argument, if accepted, would

---

[1] The Court has already rejected Flow's argument once when it declined to instruct the jury on a design defect claim and twice more when Flow's Rule 50 motions were argued.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 2 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

1 lead to absurd results.  The Court must deny Flow's motion.

2   *First*, no Washington case authority supports Flow's argument that a warranty covering
3 defects in materials and workmanship necessarily excludes defects in design.[2]  Indeed, the cases
4 relied on by Flow for the supposed distinction between design defects and defects in materials
5 and workmanship "drew a distinction between the two terms *based on California products*
6 *liability law.*"  *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices,*
7 *and Products Liability Litigation*, 754 F. Supp. 2d 1145, 1181 (C.D. Cal. 2010) (emphasis
8 added) (citing *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002); *Brothers*
9 *v. Hewlett-Packard Co.*, No. C-06-02254, 2007 WL 485979 at *4)).  But this case has nothing to
10 do with products liability.  Similarly, Flow cites to no Washington authority holding that a
11 software bug is necessarily a design defect.  By any reasonable account, a software "bug" cannot
12 constitute a design defect because "a design defect is manufactured *in accordance with* the
13 product's intended specifications," *Brothers*, 2007 WL 485979 at *4, whereas a software "bug"
14 is a clear *deviation* from the product's intended specifications.

15   Flow's argument relies on a serious misrepresentation of out-of-state cases that bear
16 little semblance to the facts of this matter.  The first case relied on by Flow, *McCabe*, is a
17 products liability case brought by an injured plaintiff and has *nothing* to do with a warranty.  100
18 Cal. App. 4th at 1120.  *McCabe* only distinguishes between manufacturing defects and design
19 defects in the context of *products liability* law.  *Id.* at 1119-20.  Flow's reliance on *Brothers*,
20 2007 WL 485979 at *4, is also misleading.  Although *Brothers* addressed a breach of warranty
21 claim, the court held that the defendant *did not breach the warranty* because it replaced the
22 warranted part and because the warranty had expired by the time the part needed to be replaced

---

[2] Under Washington law, a design defect claim is fundamentally a tort claim, codified in the Washington Product Liability Act, RCW 7.72-010-7.72.060.  "A plaintiff seeking to establish manufacturer liability for defective product design will establish liability by proving that, at the time of manufacture, the likelihood that the product would cause plaintiff's harm or similar harm, and the seriousness of those harms, outweighs the manufacturer's burden to design a product that would have prevented those harms . . . ."  *Falk v. Keene Corp.*, 113 Wn.2d 645, 654, 782 P.2d 974 (1989).

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 3 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

again. *2007 WL 485979 at \*4*. That court's citation to *McCabe* was superfluous and, in any event, only stood for the proposition that "a design defect is manufactured *in accordance with the product's intended specifications*." *Brothers*, 2007 WL 485979 at \*4.[3]

*Second*, Ruiz Fajardo has never claimed that the *design* of the waterjet cutting machine or the *design* of its software was defective. To the contrary, Ruiz Fajardo's entire claim was premised on its contention that the waterjet cutting machine was defective because it *did not meet product specifications*—an allegation antithetical to a design defect claim. Indeed, Ruiz Fajardo's liability expert, Dieter Tischler, was asked to evaluate whether "the equipment that [Ruiz Fajardo] bought from Flow *matched the product specifications*." (Nelson Decl. Ex. 2 at 109) (emphasis added). Mr. Tischler went about this task by first "review[ing] the specifications, the contract, the sales contract, to find out what was included in the package." (*Id.* at 110.) Mr. Tischler's opinion was that the Flow machine "did not meet the product specifications." (*Id.* at 123.)

Even the authority relied on by Flow recognizes that a design defect "exists when the product is built *in accordance with* its intended specifications, but the design itself is inherently defective." *McCabe*, 100 Cal App. 4th at 1119-20 (emphasis added). The evidence here overwhelmingly supports Ruiz Fajardo's contention that the waterjet cutting machine that it purchased from Flow was *not* built in accordance with its intended specifications.[4] There was no

---

[3] The unreported New Jersey district court case relied on by Flow applies the exact same standard and does *not* stand for the proposition that a software bug is necessarily a design defect. *Hughes v. Panasonic Consumer Elecs. Co.*, CIV.A. 10-846 SDW, 2011 WL 2976839 at \*19 (D.N.J. 2011). Indeed, just as with any other product, a defect in software only constitutes a design defect if the software was manufactured "'*in accordance with* the product's intended specifications.'" *Id.* (quoting *Brothers*, 2007 WL 485979 at \*4). Ruiz Fajardo's claim has only ever been that the machine did *not* meet product specifications.

[4] Flow cites approvingly to the deposition testimony of its employee, Claudia Mette. (Dkt. 98 at 10.) But Ms. Mette's testimony actually supports *Ruiz Fajardo*. Ms. Mette testified that she was not aware of *any* other customers having the same system startup problems as Ruiz Fajardo. (Dkt. 48-1 at 268.) The system startup problems experienced by Ruiz Fajardo were clearly *not* a design defect because they were *exclusive* to Ruiz Fajardo's machine.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL     - 4 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

design defect claim.

*Third*, in addition to rejecting Flow's design defect argument because it is entirely unsupported by any case authority applying Washington law and because Ruiz Fajardo's claim cannot be construed as one for a design defect even under the California cases relied on by Flow, Flow's motion must also be denied because the jury was presented with substantial evidence of *non-software* related defects. For example:

- Ruiz Fajardo's liability expert, Dieter Tischler, testified that the startup problems with the machine were mechanical: "In February, they replaced the driver for the X axis. Then in, I think it was September, maybe, they . . . replaced the encoder cable. And then, finally, in October of '16, right after the second training, one of the engineers said: 'You know what, we've got a problem with the X-axis motor, you've got to get that changed right away. The middle of December came, they changed the X-axis motor, and that was the end of the start-up problems." (Nelson Decl. Ex. 2 at 136-37.)
- Plaintiff's Exhibit No. 6: October 2013, Flow was notified of the X-axis motor failure, the failure of 1 and .5 micron filters in the high pressure pump, leaks in the intensifier pistons, and a damaged gasket and wet abrasive in the mini hopper. (Nelson Decl. Ex. 3.)
- Plaintiff's Exhibit No. 21: Flow proposed replacing both B and C axis motors, installing new mixing tubes, replacing both intensifiers, replacing the bleed down valve, replacing a gauge, replacing the cutting head, and replacing the XD motors. (Nelson Decl. Ex. 4.)
- Plaintiff's Exhibit No. 38: Flow was notified of a high pressure leak in the 94iD pump, the power cord was overheating, water was leaking in the intensifier pistons, and the X-axis motor was failing. (Nelson Decl. Ex. 5.)
- Plaintiff's Exhibit No. 39: Flow's own service reports show that replacement of the pump type and connectors was necessary, the bearing of the Y-axis was damaged, the pump operating control was deficient, there was premature wear on the deceleration resistor, there was premature wear on solid state relay, it was necessary to replace the HMI emergency stop button and the HMI Ethernet divisor, the communication switch caused a signal conflict, there was a crack in the upper part of the cutting head, there was perforation of the protective cap holding the head, and the mixing tube break caused the XD head to be uncalibrated. (Nelson Decl. Ex. 6.)
- Plaintiff's Exhibit No. 74 is Flow's internal trip summary report. This report lists the issues as: XD motor failure, premium mixing tube life, HyperJet poor seal life, bleed down valve poor seal life, 90 degree fitting failure, and on/off valve poor life. Flow recommended replacing both the B and C axis, replacing the water sensor, rebuilding or replacing intensifiers, rebuilding the bleed down valve, and replacing the pressure gauge. In addition to a "software bug" being listed as a possible root cause for many issues, Flow also identified "installation" as a root cause for seven issues. (Nelson Decl. Ex. 7.)

The evidence overwhelmingly establishes that there were a myriad of defects present in Ruiz

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL       - 5 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

Fajardo's waterjet cutting machine. Although Ruiz Fajardo emphasized that the software was defective throughout the trial, the jury also heard expert testimony and reviewed internal Flow documents establishing that there were significant mechanical defects present in the system from the beginning.

*Fourth*, the Court should also reject Flow's design defect argument because, if accepted, it would produce absurd results. Flow essentially asks this Court to create a *massive* exception to the already limited warranty afforded to Ruiz Fajardo. If software defects are automatically excluded from Flow's limited warranty, Flow could sell waterjet cutting machines without even writing the software necessary to run them—leaving buyers with a completely inoperable machine and virtually no recourse against Flow.[5] The Court must not sanction such a result.

Flow asks this Court to create new law in Washington, designed to allow Flow to escape liability for selling a defective waterjet cutting machine to Ruiz Fajardo. To accept Flow's argument and grant its motion for judgment as a matter of law is to accept that (1) a standard warranty for defects in materials and workmanship *necessarily* excludes a defect in design; (2) any software related defects are *necessarily* design defects; and (3) no reasonable juror could have found that there were non-software related defects in Ruiz Fajardo's machine. Each step is a bridge too far and, accordingly, Flow's motion must be denied.

### 2. Lost Profits Were Properly Recoverable Under Washington Law.

Although Flow purports to renew its Rule 50 motion concerning lost profits, Flow summarily asserts in a footnote that the "jury did not award Ruiz Fajardo lost profits" and

---

[5] Imagine a buyer purchasing an upgraded Tesla Model S for roughly $100,000, complete with a warranty for defects in materials and workmanship. Upon purchase, the buyer discovers that the car will not start for over an entire year. After repairing the startup problems, the car cannot accurately calculate driving speed and, worse, randomly shuts off while in use. Clearly, the car is defective. Because software is a major component of the Tesla Model S, all of the defects can be attributed, at least in part, to faulty software. Under Flow's line of reasoning, however, the Buyer would have no recourse against Tesla for these software defects, even if the defects are a clear deviation from the intended design. Such a result is simply absurd and would extend far beyond Ruiz Fajardo's waterjet cutting machine, as software is now a major component of nearly all consumer goods.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL   - 6 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

therefore declines to brief the issue.  (Dkt. 98 at 4, n. 1.)  But Flow never asked the jury to differentiate between damages resulting from lost profits, damage to reputation, or the difference in value of the machine as contracted and at the time of breach.  As discussed further below, the Court must reject Flow's improper characterization of this issue.  Flow's motion must be denied.

**B.     The Court Must Deny Flow's Motion for a New Trial.**

Pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), the "court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "The trial court may grant a new trial only if the jury's verdict was against the clear weight of the evidence."  *Union Oil Co. of Cal. V. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003).  A new trial is appropriate only if "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (quoting 11C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48-49 (1973)).

**1.     The Evidence Overwhelmingly Supports the Jury's Verdict.**

Flow's argument that the jury's verdict was against the clear weight of the evidence must be rejected for two reasons.  First, Flow repeats its erroneous contention that the jury could not have awarded Ruiz Fajardo lost profits because the jury did not award the entire amount sought by Ruiz Fajardo.  But Flow never asked the jury to differentiate between the types of damages that it awarded.  (Dkt. 50 at 29-30.)  Flow's post-trial argument thus requires the Court to speculate about what each juror may or may not have awarded Ruiz Fajardo.  Second, even if the Court accepts Flow's specious argument that no juror awarded lost profits, the evidence presented to the jury *overwhelmingly* supports the jury's determination that the machine was worthless to Ruiz Fajardo at the time of breach.

The jury was instructed that the measure of damages for breach of warranty "is the

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 7 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." (Dkt. 67 at 23.)  The jury was also instructed that it could award Ruiz Fajardo incidental damages, consequential damages resulting from lost profits, and consequential damages resulting from damage to reputation or goodwill.  (*Id*.)  The jury ultimately awarded Ruiz Fajardo $437,830.00 in unspecified damages.  (Nelson Decl. Ex. 1.)

The jury was presented with substantial evidence establishing the fact of damage as it relates to lost profits.[6]  Ruiz Fajardo introduced expert testimony that Ruiz Fajardo's damages resulting from lost profits totaled roughly $1,000,000.  Flow introduced rebuttal expert testimony that called into question the *amount* of lost profits claimed by Ruiz Fajardo.  Following the entry of judgment in favor of Ruiz Fajardo, Flow now summarily asserts that the jury refused to award Ruiz Fajardo damages resulting from lost profits.[7]  Flow's entire basis for this assertion rests on a single question from the jury, asking whether the jury could award the contract price of the machine in lieu of lost profits. (Dkt. 72.)  Flow invites the Court to peer into the minds of the jurors and conclude that the jury, as a whole, refused to award lost profits based on this question. But it would be inappropriate to impute the jury's question, which may have been asked by as few as one juror, to the entire jury, and then merge that question with the verdict form.  The jury made no finding as to lost profits, damage to reputation or good will, or the difference in value

---

[6] Lost profits "are properly recoverable as damages where (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate cause of defendant's breach, and (3) they are proven with reasonable certainty." *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 396 P.2d 879 (1964). "The third element, dealing with certainty, 'is concerned more with the *fact of damage than with the extent or amount of damage.*" *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 710 (9th Cir. 1990) (quoting *Alpine Indus., Inc. v. Gohl*, 30 Wn. App. 750, 645 P.2d 737 (1982)). "This comports with the long-held view that a defendant should not profit from the difficulty in proving exact damages, particularly if his breach contributes to that difficulty." *Milgard*, 902 F.2d at 710.

[7] Flow conveniently ignores that the jury was also instructed that Ruiz Fajardo may recover consequential damages stemming from damage to reputation or goodwill. (Dkt. 67 at 23.)  Because the jury was not asked to differentiate between the categories of damages it awarded, there is no way to know whether the jury awarded this type of damages.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL     - 8 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

between the machine as contracted and at the time of breach. Flow's argument that the damages awarded by the jury could *only* have been the value differential at the time of breach must be rejected.

In any event, even assuming that the jury did not award lost profits, the evidence *overwhelmingly* supports the jury's decision to award Ruiz Fajardo $437,830.00 in damages. As discussed, the jury was instructed that the measure of damages for breach of warranty is the difference in value of the machine at the "time and place of acceptance" and the value the machine would have had if it had been as warranted. (Dkt. 67 at 23.) The jury was provided with extensive evidence establishing that Ruiz Fajardo purchased the machine to make a very specific cut and that the machine was unable to make that cut. This alone rendered the machine worthless:

- Ruiz Fajardo's liability expert, Mr. Tischler, testified that Ruiz Fajardo was looking specifically for "features like 3D bevel cutting, which is very specific to cutting on large plates of metal." (Nelson Decl. Ex. 2 at 112-13.) Mr. Tischler testified that "[o]ne of the things [Ruiz Fajardo's] business was built on was doing beveling of large plates." (*Id.* at 115.) Nevertheless, "[t]he 3D cutting that [Ruiz Fajardo] needed to do, they can't do. And they still can't do [it]. They have not been delivered a piece of equipment that allows them to do the 3D-bevel cutting." (*Id.* at 124.)
- The inability to perform bevel cuts was not the only defect that rendered the machine worthless. Mr. Tischler testified that "[i]n a sense, even the basic functionality wasn't there. The reality was the machine, from when it was installed, until December of 2014, did not start according to the operator's manual." (*Id.* at 123.)
- Flow's attempted fixes did nothing to add value to a machine that could not startup correctly or perform bevel cuts. Mr. Tischler testified that "the workarounds were very time intensive and created major problems. That fact alone, from a turnaround perspective, for [Ruiz Fajardo], really, really was a problem for them. I'd say borderline *worthless*, as far as the machine goes. It was a tremendous burden." (*Id.* at 123) (emphasis added).

Indeed, the jury was well aware that Ruiz Fajardo only purchased the waterjet cutting machine with the intent of utilizing it for a new business line. But Ruiz Fajardo was never able to accomplish this because the machine *did not work* upon delivery. The machine was worthless to Ruiz Fajardo at the time and place of acceptance.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL     - 9 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

In arguing that the jury's verdict was against the clear weight of the evidence, Flow repeatedly cites to portions of the record that address how the machine was working *after* Flow began attempting to repair the machine. (*See* Dkt. 98 at 12.) But the relevant time period is the "time and place of acceptance," i.e. when the machine was delivered to Ruiz Fajardo, not *years later*. The evidence overwhelmingly establishes that Ruiz Fajardo's machine was virtually worthless to Ruiz Fajardo upon receipt because it *did not work*.[8] Flow's attempt to use irrelevant evidence of the machine's performance *years* after delivery should be rejected. Flow's motion must be denied.

### 2. The Jury Was Properly Instructed.

"Instructions to the jury are reviewed for whether they were 'misleading or confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact-finding process.'" *Thomas*, 289 F. Supp. 3d at 1226-27 (quoting *United States v. Warren*, 25 F.3d 890, 898 (9th Cir. 1994)).

The parties submitted a joint set of disputed jury instructions to the Court prior to trial. Flow's proposed instruction on express warranties contained a misleading instruction concerning design defects that stated, "A defect in workmanship or material does not include a design defect. A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." (Dkt. 50 at 24.) The Court heard argument on the proposed instructions and declined to include Flow's design defect instruction. (Dkt. 67 at 18.) Flow now asserts that the Court's instruction on express warranties was incomplete and prejudiced Flow. Nothing could be further from the truth.

As discussed herein, no Washington authority supports Flow's argument that a defect in

---

[8] Flow similarly conflates Ruiz Fajardo's ability to use portions of the machine for some discrete tasks with the actual value of the machine to Ruiz Fajardo. The jury heard evidence that Ruiz Fajardo purchased the machine to start a new business line. Ruiz Fajardo was unable to start its new business line because of the serious defects in the machine. That Ruiz Fajardo was able to make a few cuts in between the machine not starting and randomly shutting down does not diminish that Ruiz Fajardo could not use the machine for the only reason that it was purchased.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 10 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

workmanship or materials necessarily excludes a defect in design. But Flow's argument fails for a number of other reasons as well. First, neither of the cases cited by Flow in its proposed instruction support the statement that "A defect in workmanship or material does not include a design defect." (Dkt. 50 at 24.) Whereas Ruiz Fajardo's proposed instruction was taken directly from the UCC and relevant case authorities, Flow's proposed instruction was crafted out of whole cloth.[9] The Court was correct to reject Flow's erroneous statement of the law. Second, Flow's proposed instruction would not have changed the jury's verdict because the centerpiece to Flow's theory—that a software bug is a design defect—was never even proposed as an instruction. Such an instruction would have been an incorrect statement of the law. But without this missing link, Flow's proposed design defect instruction would have done little more than confuse and mislead the jury.

The Court's jury instructions were clear and allowed Flow to argue its theory of the case—that there were no defects whatsoever, either mechanical or software related. The jury heard testimony from Flow's lay and expert witnesses that there was nothing wrong with the machine and the jury rejected that evidence. Nothing about Flow's proposed instruction would have changed that result. Flow's motion must be denied.

**C.   The Court Must Deny Flow's Motion to Extend the Rule 62 Stay.**

"The district court may only stay execution of the judgment pending the disposition of certain post-trial motions or appeal if the court provides for the security of the judgment creditor." *Peacock v. Thomas*, 516 U.S. 349, 259 n.8, 116 S. Ct. 862, 133 L. Ed. 2d 817 (1996). "The bond secures the judgment against insolvency of the judgment debtor and is usually for the

---

[9] The only authorities cited by Flow in support of its proposed instruction were *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 985 (N.D. Cal 2014), yet another case that addressed design defects in the context of a product liability claim, and *Lombard Corp. v. Quality Aluminum Products Co.*, 261 F.2d 336, 338 (6th Cir. 1958), in which the claim was that the design "was not adequate to execute the purpose for which it was bought," i.e. the product *conformed with product specifications*. Neither case supported Flow's proposed instruction that "A defect in workmanship or material does not include a design defect." (Dkt. 50 at 24.)

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL    - 11 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

full amount of the judgment, though the district court has discretion in setting the amount." *Strong v. Laubach*, 443 F.3d 1297, 1299 (10th Cir. 2006). "[I]f an unsecured stay is to be granted, the burden is on the defendants to demonstrate affirmatively that posting a bond or otherwise providing adequate security is impossible or impractical." *Int'l Wood Processors v. Power Dry, Inc.*, 102 F.R.D. 212, 214 (D.S.C. 1984).

Flow asks the Court to extend Rule 62's automatic 30 day stay of execution of a judgment until the post-trial motions are decided, *without bond or other security*. In so requesting, Flow does not bother to explain why providing adequate security is impossible or impractical. To the contrary, Flow implies the opposite—that Flow is a "well-established" company that has been operating for 40 years. There is no reason why Flow should be excused from the security requirement of Rule 62 simply because it does not want to bother with a bond.

Ruiz Fajardo has significant concerns about its ability to collect on the judgment without a bond or other security. As established at trial, Flow laid off roughly 110 employees working at its Kent facility in 2018, citing the rising cost of manufacturing in the Seattle region. (Nelson Decl. ¶ 11.) Flow's contention that Ruiz Fajardo will not be prejudiced by extending the Rule 62 stay requires Ruiz Fajardo to simply trust that Flow will not dissolve or otherwise make collecting on its judgment impossible. The Court should deny Flow's unsupported request to extend the stay without security.

### III.   CONCLUSION

Ruiz Fajardo introduced overwhelming evidence—credited by the jury—that the waterjet cutting machine that it purchased from Flow did not meet product specifications and was therefore defective. Flow's contention that the Court and the jury must have gotten something wrong is unsupported by either Washington law or the evidence that was before the jury. Accordingly, the Court should deny all three of Flow's post-trial motions.

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL    - 12 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

1  DATED this 18th day of March, 2019.

2                                       BETTS, PATTERSON & MINES, P.S.

3

4                                       By  */s James D. Nelson*
                                        By  */s Shaina R. Johnson*
5                                       By  */s Jesse L. Taylor*
                                            James D. Nelson, WSBA #11134
6                                           Shaina R. Johnson, WSBA #46079
                                            Jesse L. Taylor, WSBA #51603
7                                       Betts, Patterson & Mines, P.S.
                                        One Convention Place, Suite 1400
8                                       701 Pike Street
                                        Seattle WA  98101-3927
9                                       Telephone:     (206) 292-9988
                                        Facsimile:     (206) 343-7053
10                                      E-mail:        jnelson@bpmlaw.com
                                        E-mail:        sjohnson@bpmlaw.com
11                                      E-mail:        jtaylor@bpmlaw.com
                                        Attorneys for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL      - 13 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001

# CERTIFICATE OF SERVICE

I, Karen L. Pritchard, hereby certify that on March 18, 2019, I electronically filed the following:

- **Plaintiff Ruiz Fajardo's Opposition to Flow's (1) Renewed Motion for Judgment as a Matter of Law, (2) Motion for a New Trial, and (3) Motion for Extension of the Rule 62 Stay of Enforcement; and**

- **Certificate of Service.**

with the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for Defendant Flow International Corporation*
Andrew Escobar
Jeffrey DeGroot
Alexandria Walker
DLA Piper LLP
701 5th Ave Ste 7000
Seattle, WA 98104-7044

DATED this 18th day of March, 2019.

　　　　　　　　　　　　　　　　　　　　/s  Karen L. Pritchard
　　　　　　　　　　　　　　　　　　　　Karen L. Pritchard, Legal Assistant

PLAINTIFF RUIZ FAJARDO'S
OPPOSITION TO FLOW'S POST TRIAL    - 14 -
MOTIONS (2:16-CV-01902-RAJ)

Betts
Patterson
Mines
**One Convention Place**
Suite 1400
701 Pike Street
Seattle, Washington 98101-3927
(206) 292-9988

1379756/031819 1527/8404-0001